739 A.2d 141

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Craig MURPHY, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 19, 1999.

Decided Oct. 28, 1999.

Norris E. Gelman, Philadelphia, for Craig Murphy.

Catherine Marshall, Philadelphia, for the Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION OF THE COURT

CASTILLE, Justice.

In this direct appeal of the denial of his petition filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541 *et seq.* ("PCRA"), appellant alleges that his trial counsel was ineffective in several respects during both the guilt phase and penalty phase of his trial. For the reasons set forth below, appellant is not entitled to relief and the ruling of the PCRA court upholding the judgment and sentence of death is affirmed.

On July 31, 1988, following a jury trial, appellant was convicted of first-degree murder in the death of Raymond Gambrell and terroristic threats against a witness, Steven Brown. Pursuant to 42 Pa.C.S. § 9711(d), the jury found one aggravating circumstance: that the defendant had a significant history of violent felony convictions involving the use or threat of violence to the person.[1] The jury also found two mitigating circumstances: the age of the defendant at the time of the killing (24 years of age),[2] and the catchall circumstance.[3] The jury determined that the one aggravating circumstance outweighed the two mitigating circumstances and, pursuant to 42 Pa.C.S. § 9711(f), returned a penalty phase verdict of death. Post-verdict motions were heard and denied.

On April 18, 1995, on direct appeal, this Court affirmed appellant's conviction and judgment of sentence. *Commonwealth v. Murphy*, 540 Pa. 318, 657 A.2d 927 (1995). The

1. 42 Pa.C.S. § 9711(d)(9). Specifically, appellant had three previous murder convictions and a conviction for aggravated assault which resulted in the victim's permanent paralysis.

2. 42 Pa.C.S. § 9711(e)(4).

3. 42 Pa.C.S. § 9711(e)(8)("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

Court summarized the facts giving rise to appellant's convictions as follows:

A review of the record reveals that on January 21, 1981, Raymond Gambrell, the deceased, and his friend, Steven Brown, spent the day travelling from one liquor establishment to another purchasing wine to consume. At about 10:30 p.m., they were walking down Clearfield Street in North Philadelphia where they encountered appellant and two of his cohorts who were in a Buick parked between Rosewood and Carlisle Streets. As Gambrell and Brown walked past the parked automobile, appellant made "smart" remarks to them; however, they continued on their way. Later that evening, while Gambrell and Brown were drinking a newly purchased bottle of wine, they saw the appellant and his cronies circling the block in the Buick stalking them.

At approximately 1:00 a.m. on January 22, 1981, after another trip to a speakeasy, Gambrell and Brown encountered appellant and his cohorts who were in the Buick at 15th and Clearfield Streets. As they walked past the car, appellant said, "There they go." Appellant then got out of the car from his driver's seat and confronted Raymond Gambrell by the steps to an apartment building next to a vacant lot. Brown stood by as appellant accused Gambrell of breaking into appellant's mother's house. Gambrell told appellant that he did not do it. Appellant then pulled out a gun and told Brown to get into the car. When he hesitated, appellant said to Brown, "You think I'm playing, get in the car . . . sit between them."

After he was inside the car, seated between Ronald and Bernie Smith in the back seat along with Dennis Cook, Brown saw appellant place his gun to Gambrell's head and escort him to the vacant lot. Moments later, two gunshots rang out from the direction of the lot.

When appellant returned to the automobile with his gun in hand a couple of minutes later, one of appellant's cronies asked him where he shot Gambrell. Appellant replied, "Where do you think?" Another passenger in the Buick then said, "If you shot him where I think you shot him, he's

dead, you got a body." Appellant then turned around, pointed his gun at Brown and said, "You better not say anything because, I swear to Allah, I'm going to get you no matter where you're at." He then drove away from the scene and dropped Brown off at Broad and Olney Street at around 1:30 a.m. Before leaving though, appellant told Brown that if the police were to question him about this incident, he should tell them that he was not with Gambrell that evening.

At approximately 1:54 a.m., the police discovered Gambrell lying on his back in the vacant lot. The police officers observed blood flowing from the bridge of his nose, his right ear, and the back of his head. Subsequently, they located Brown, who was brought in at 4:30 a.m. Brown, although visibly nervous and frightened, made a statement to police implicating appellant. On February 3, 1981, an arrest warrant for appellant was executed.

Dr. Halbert Fillinger, who had performed the autopsy on the deceased, testified at trial that the cause of death was a gunshot wound to the head and the manner of death was homicide. It was his testimony that the projectile, a .38 caliber bullet, traveled back to front and right to left causing severe damage to the brain. A firearms examiner also testified that the .38 caliber bullet obtained from Gambrell's head was likely fired from a .357 caliber Smith and Wesson revolver. Sergeant Schmid of the Philadelphia Police Department testified that a .357 caliber Smith and Wesson revolver was found in appellant's possession when he was arrested.

Gail Brown testified at trial that on the morning of January 22, 1981, her brother, Steven Brown, visited her. Brown, who was usually a strong person, told his sister that he was scared and frightened because threats had been made against the family and he was afraid for his life. Consequently, his family sent him to Portland, Maine to stay with his brother.

As a result, the preliminary hearing in this case was continued because the Commonwealth's star witness, Steven Brown, failed to appear. Two more scheduled dates passed

while Brown was in Maine. Following the third listing on March 5, 1981, the trial court discharged appellant. On May 1, 1981, Steven Brown returned to Philadelphia. Two weeks later he was gunned down.

On May 13, 1981, Steven Brown was sitting on the porch of Jerome Watson's house located at 3122 N. 15th Street. Wanda Wilson, then ten years old, observed appellant stealthily approach the bushes in front of Watson's house and open fire, killing Brown. [footnote omitted]. Renee Jones, who lived with appellant from 1979 to 1981, testified that she also saw appellant shoot up onto the porch of Watson's house. She then observed appellant and Bernie Smith jump into a car and take off down the street. Renee Jones further testified that appellant had told her that he shot Raymond Gambrell because Gambrell had broken into his mother's house. Moreover, in a statement she had given to police on February 24,1986, Renee Jones stated that appellant shot Steven Brown because he was a witness to the Gambrell killing. [4]

*Commonwealth v. Murphy*, 540 Pa. 318, 324–27, 657 A.2d 927, 930–31 (1995).

Subsequent to this Court's affirmation of the judgment and sentence of death, new counsel was appointed and filed a petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541 *et seq.* On July 5, 1997, the trial court dismissed the petition without a hearing. Pursuant to 42 Pa.C.S. § 9546(d), this Court has jurisdiction to review the PCRA court's ruling upholding the sentence of death.

Under the version of the PCRA at issue here,[5] appellant must satisfy the following requirements to be eligible for relief:

4. Appellant was tried, convicted and sentenced to death for the murder of Steven Brown. Subsequently, while the instant matter was pending on direct appeal, this Court reversed appellant's conviction and sentence stemming from the Brown murder in *Commonwealth v. Murphy*, 527 Pa. 309, 591 A.2d 278 (1991). Appellant has since pled guilty to the first-degree murder of Brown in exchange for an agreed-upon life sentence.

5. Since appellant's PCRA filing pre-dated the November 17, 1995 amendments to the PCRA, the standards set forth below are drawn

(a) General rule. To be eligible for relief under this subchapter, a person must plead and prove by a preponderance of the evidence all of the following:

. . . .

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of Pennsylvania or the laws of this Commonwealth or the Constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

. . . .

(3) That the allegation of error has not been previously litigated and that one or more of the following applies:

(i) The allegation of error has not been waived.

(ii) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual.

(iii) If the allegation of error has been waived, the waiver of the allegation of error during pretrial, trial, post-trial or direct appeal proceedings does not constitute a state procedural default barring federal habeas corpus relief.

42 Pa.C.S. §§ 9543(a)(2) and (3)(1988).

 Appellant's claims in this matter fall under the rubric of ineffective assistance of counsel. The standard of review for such claims is well-settled. A criminal defendant sustains a claim of ineffective assistance of counsel by proving by a preponderance of the evidence: (1) that the underlying claim is of arguable merit; (2) that counsel's performance had

from the version of the PCRA that existed prior to the 1995 amendments. *Commonwealth v. Copenhefer,* 553 Pa. 285, 298 n. 5, 719 A.2d 242, 249 n. 5 (1998).

no reasonable basis; and (3) that counsel's ineffectiveness worked to his prejudice. *Commonwealth v. LaCava*, 542 Pa. 160, 178, 666 A.2d 221, 229 (1995)(citing *Commonwealth v. Edmiston*, 535 Pa. 210, 237, 634 A.2d 1078, 1092 (1993)). In order to establish "prejudice," appellant must demonstrate that, but for the errors or omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (1999).

 Trial counsel's assistance is deemed constitutionally effective if the particular course chosen by counsel was reasonably designed to effectuate his client's interests. *Commonwealth v. Pierce*, 515 Pa. 153, 158, 527 A.2d 973, 975 (1987). The law presumes that trial counsel was not ineffective. *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). A claim of ineffective assistance will not be deemed waived so long as appellant has "layered" the claim by alleging the ineffective assistance of all of his previous counsel for failing to pursue it. *See Commonwealth v. Chmiel*, 536 Pa. 244, 250, 639 A.2d 9, 12 (1994).[6]

## I. *GUILT PHASE*

 Appellant's first argument focuses on trial counsel's alleged ineffectiveness for failing to object to a portion of the trial court's charge to the jury. Specifically, appellant contends that the following portion of the trial court's charge misled the jury with respect to the meaning of "reasonable doubt" and diluted the Commonwealth's burden of proof:

> In this case, there is a dispute about the facts of an earlier event, what, in fact, did occur and who did, in fact, shoot one Raymond Gambrell.... *It is impossible for any factfinder to acquire unquestionably accurate and unattackable knowledge of what occurred in this case. Instead, **all that you, as jurors and factfinders, can acquire is a belief of what probably happened.*** Accordingly, the law prescribes

---

**6.** All of the ineffectiveness claims presented by appellant herein have been properly "layered" and are thus preserved for this Court's review, as trial counsel also handled the direct appeal in this matter.

or establishes a standard of proof beyond a reasonable doubt. As a matter of judicial wisdom, I have explained that term to you to assure the least margin of error in your factfinding functions.

Appellant's Brief at 16 (emphasis in Brief)(quoting N.T. 7/29/88 at 2586–87).

■■■■ This Court will not review a charge to the jury by focusing on one or two words taken out of the context within which they were spoken. *Commonwealth v. Stokes,* 532 Pa. 242, 252, 615 A.2d 704 (1992). When evaluating the adequacy of jury instructions, the charge must be read in its entirety. *Commonwealth v. Prosdocimo,* 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990). Error cannot be predicated on isolated excerpts of the charge; it is the general effect that controls. *Commonwealth v. Lesher,* 473 Pa. 141, 148, 373 A.2d 1088 (1977). However, language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. *Francis v. Franklin,* 471 U.S. 307, 322, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). When a jury is given a correct and incorrect instruction on a critical legal point, reversible error occurs when the incorrect instruction is not expressly withdrawn. *Commonwealth v. Broeckey,* 364 Pa. 368, 374, 72 A.2d 134, 136 (1950).

Here, when the trial court's instruction on the critical point of the definition of "reasonable doubt" is read in its entirety, it is clear that the jury received a correct and unambiguous instruction. In the reference excerpted by appellant, when the trial court mentioned the phrase "reasonable doubt," the trial court reminded the jurors that it had previously explained that phrase to them in order to assure the least margin of error in their factfinding functions. The trial court at that point was referring to a detailed explanation of the concept of "reasonable doubt" which it had just furnished to the jurors. In part, the charge provided as follows:

What is a reasonable doubt? .... A reasonable doubt is such a doubt as would cause a prudent, careful and sensible person to pause, hesitate, restrain himself or herself before acting upon a matter of the highest importance in his or her

affairs. . . . . Therefore, should you, after considering the evidence, have in your mind such a doubt as to cause you to hesitate in arriving at a conclusion in matters of importance to yourself, then it is your duty to give the defendant the benefit of that reasonable doubt and find him not guilty. . . . . So, in summation, you must not find the defendant guilty on a mere suspicion or conjecture or surmise of guilt. A conviction must never be based upon conjecture or surmise. The evidence must be such as reasonably justifies an inference of guilt of the accused and is of such volume and quality as to overcome and set aside the presumption of innocence. . . . .

N.T. 7/29/88 at 1278–81.

When read against the backdrop of the trial court's comprehensive charge on the definition of "reasonable doubt," the portion of the charge at issue here did not mislead the jury. The trial court, after a thorough reasonable doubt charge, simply informed the jury that it would have to determine how the murder "probably happened." The trial court did not tell the jury that it would have to determine whether the defendant was "probably guilty." The court was simply reminding the jurors that, as none of them had actually witnessed what happened, all the conflicting evidence and testimony would have to be assessed in terms of probabilities. This information in no way diluted the concept of "reasonable doubt" which had already been explained extensively. Accordingly, appellant's first claim of ineffective assistance fails on its underlying merits.

■ Appellant's second claim of ineffective assistance focuses on trial counsel's failure to object to a separate portion of the trial court's charge pertaining to the concept of "reasonable doubt." Specifically, appellant believes that the following emphasized portions of the instruction were flawed:

A doubt to be reasonable must be one which fairly strikes a conscientious mind and clouds the judgment. . . . . A reasonable doubt is not merely an imagined or passing fancy that may come into the mind of a juror. *It must be a doubt*

*arising from the evidence that is* **substantial and well founded** *on reason, thinking and common sense.*

A reasonable doubt such as would be taken notice of by a jury in deciding a case, or an issue or question in the case, is of the same nature as a doubt that would cause a reasonable man or woman, in the conduct of his or her own affairs in a matter of importance to himself or herself, to stop, hesitate, and seriously consider as to whether he or she should do a certain thing before finally acting.

*Further, a reasonable doubt is something different and much more* **serious** *than a possible doubt.*

N.T. 7/29/88 at 2579–80 (emphasis in appellant's Brief).[7]

Contrary to appellant's assertions, there was no reason for trial counsel to object to the use of the terms "substantial," "well founded on reason and common sense," and "serious" in the course of the trial court's reasonable doubt instruction. Indeed, this Court has upheld a lengthy explanation of reasonable doubt which included references virtually identical to those which appellant protests. *See Commonwealth v. Stokes,* 532 Pa. 242, 252, 615 A.2d 704, 709 (1992)(upholding a jury charge which provided that "A reasonable doubt is not merely an imagined or passing fancy that may come into the mind of a juror. It must be a doubt arising from the evidence that is substantial and well founded on reason and common sense."). As the Court in *Stokes* noted, the key point regarding the use of words like "substantial" and "well founded on reason and common sense" was that the tenor of the portion of the charge using these words was to contrast reasonable doubt with imaginary or possible doubt. *Id.* at 255, 615 A.2d at 710. Similarly, in this matter, the trial court used the words at issue to contrast the concept of reasonable doubt with the concepts of "imaginary" and "possible" doubt. Accordingly, appellant's instant claim of ineffective assistance fails on its underlying merits under this Court's jurisprudence.

7. The Commonwealth contends that this claim was previously litigated on direct appeal when appellant argued that the trial court was required to repeat its definition of reasonable doubt at the penalty phase. We determine that the claim which this Court denied in appellant's direct appeal is distinct from the claim which appellant raises here.

However, appellant separately urges that this Court's decision in *Stokes* is no longer good law under the United States Supreme Court's decision in *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).[8] Specifically, appellant contends that the decision in *Victor* requires the trial court to draw an *explicit* distinction between the concepts of "substantial doubt" and "fanciful conjecture" if it chooses to use the terms "substantial doubt." The charge approved in *Victor* read as follows: "A reasonable doubt is an actual and substantial doubt . . . as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." *Id.* at 6, 114 S.Ct. 1239. Here, although the trial court did not specifically invoke the language "as distinguished from" in separating the concept of substantial doubt from that of possible or imaginary doubt, the Court's language made it perfectly clear that the phrase "substantial doubt" was invoked only as a comparison to possible or imaginary doubt. "A reasonable doubt is not merely an imagined or passing fancy that may come into the mind of a juror. It must be a doubt arising from the evidence that is substantial and well founded on reason, thinking and common sense." N.T. 7/29/88 at 2579–80. This language is not distinguishable in any meaningful way from the language approved by the United States Supreme Court in *Victor.*

Furthermore, although the *Victor* Court believed that the use of the phrase "substantial doubt" was "somewhat problematic," the Court refused to overturn the judgment because, elsewhere in the charge, the trial court had "provided an alternative definition of reasonable doubt as a doubt that

**8.** Appellant urges that this Court may consider *Victor* and several other United States Supreme Court cases on which he relies in assessing trial counsel's performance, even though *Victor* was not decided until after appellant's trial, because these cases were direct and foreseeable descendants of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Commonwealth counters that there is no need to consider appellant's retroactivity arguments because the jury instructions in this case were clearly consistent with the cases cited. Because we agree with the Commonwealth on this point, we will not consider appellant's retroactivity arguments, but will assume *arguendo* that *Victor* and the other cases cited by appellant are applicable in assessing trial counsel's performance.

would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved." *Id.* In the instant matter, appellant's jury was provided with the same alternative definition which the *Victor* Court deemed sufficient to cure the putative problem with the phrase "substantial doubt." Accordingly, appellant's trial counsel cannot be deemed ineffective for failing to object to the jury instruction at issue under either this Court's jurisprudence or the authority of *Victor.*

■ Appellant next alleges the ineffectiveness of trial counsel for failing to object when the trial court provided the jury with its non-binding opinion that there was no evidence of voluntary manslaughter. At the conclusion of its charge to the jury on the elements of voluntary manslaughter, the trial court stated as follows:

> This Court is about to give its opinion on whether or not the facts supported by the evidence in this case show the defendant committed voluntary manslaughter. Clearly understand that you are not bound by my opinion or what I am about to say in any way, shape, or form. You are the factfinders. You are to consider voluntary manslaughter equally with all the other verdicts in this case. If you want to return that verdict, it is your power to do so and feel free to do so.... [I]t is the opinion of this Court that there is no evidence of the crime of voluntary manslaughter in this case.... (N.T. 7/29/88 at 2668–69).

At the time of appellant's trial, appellant was entitled to a voluntary manslaughter instruction based upon the theory of the jury's "mercy dispensing power." *See Commonwealth v. Carter,* 502 Pa. 433, 437–40, 466 A.2d 1328, 1330–31 (1983). However, at the time of appellant's trial, this Court had also determined that the trial court could include with its instruction on voluntary manslaughter "a statement of opinion that insufficient evidence existed to support a voluntary manslaughter charge if, in fact, the evidence is insufficient." *Commonwealth v. Scaramuzzino,* 485 Pa. 513, 517, 403 A.2d 82 (1979)(plurality); *Commonwealth v. Bennett,* 471 Pa. 419, 427, 370 A.2d 373 (1977). Such an expression of opinion is proper

as long as the court clearly states that its opinion is not binding on the jury. *Commonwealth v. Milton,* 491 Pa. 614, 421 A.2d 1054 (1980). Here, there was no evidence of record to support a voluntary manslaughter verdict, and appellant does not now claim that there was any such evidence. Thus, under this Court's precedent, the trial court's instruction in the instant matter was appropriate. Accordingly, trial counsel cannot be faulted for declining to object on meritless grounds.

Next, appellant contends that trial counsel was ineffective for failing to object to the trial court's charge informing the jury that it could infer malice from the use of a deadly weapon on a vital part of the victim's body. Appellant claims that the combination of this instruction and the court's nonbinding opinion that there was no evidence of voluntary manslaughter, discussed *supra,* could only result in a conclusive presumption of malice arising from the use of a deadly weapon on a vital part of the victim's body. In relevant part, the trial court instructed the jury as follows:

> As a matter of law, you may infer legal malice from the intentional use, without legal excuse or justification, of a deadly weapon on a vital part of the victim.
>
> . . . .
>
> The inference of malice which arises from the use by the killer of a deadly weapon to a vital part of the body is one which you are at liberty to apply or not apply as you see fit. More specifically, the legal term would be that it is a *permissible* and not a mandatory evidentiary inference or conclusion. If you find that there were any qualifying facts indicating a contrary intent, such facts would prevent the application of this principle by you. In conclusion, you may infer from such conduct that the act was done with malice, but if you find facts from the circumstances surrounding the defendant's conduct indicating an inconsistent or contrary intent on his part, you would not draw the inference of malice.

N.T. 7/29/88 at 2651–52 (emphasis added). This instruction is consistent with long-standing jurisprudence of this Court holding that a jury may infer malice from an accused's use of a

deadly weapon against a vital part of another's body. *Commonwealth v. Ly*, 528 Pa. 523, 537, 599 A.2d 613, 619 (1991)(instruction that malice and intent to kill may be inferred from the use of a deadly weapon on a vital part of the body was proper and did not shift the burden of proof to the defendant). *Accord Commonwealth v. Carbone*, 524 Pa. 551, 574 A.2d 584 (1990), *citing Commonwealth v. Butler*, 446 Pa. 374, 288 A.2d 800 (1972). Since the challenged instruction was appropriate, and since we have already determined that the Court's instruction on voluntary manslaughter was appropriate, trial counsel acted reasonably by declining to object to the charge at issue here. Accordingly, the instant claim of ineffective assistance fails.

Appellant's final claim of ineffective assistance in the guilt phase also centers on the above-excerpted portion of the trial court's charge relating to the inference of malice which may be drawn from the use of a deadly weapon on a vital part of the victim's body. Specifically, appellant complains that after the trial court informed the jury about the nature of the permissive inference, it stated that: *"If you find* that there were any qualifying facts indicating a contrary intent, such facts would prevent the application of this principle ... you may infer from such conduct that the act was done with malice, but *if you find facts* from the circumstances surrounding the defendant's conduct indicating an inconsistent or contrary intent on his part, you would not draw the inference of malice." (Appellant's Brief at 37, quoting from N.T. 7/29/88 at 2652)(emphasis in Appellant's Brief). Appellant contends that the trial court impermissibly shifted the burden to appellant to demonstrate the absence of malice by proving qualifying facts or circumstances. However, appellant takes the language in question out of context. In the portion of the charge at issue, the trial court simply stated to the jury that although it was permitted to draw an inference of malice based on use of a deadly weapon against a vital part of the victim's body, it could not draw such an inference if it found qualifying facts evidencing a contrary intent. The trial court did not tell the jury that the absence of such qualifying facts negated the

presumption of innocence with respect to malice. Rather, it told them that the presence of such facts negated its ability to draw the common inference that malice may be equated with use of a deadly weapon on a vital part of the victim's body. This instruction corresponds with the jurisprudence of this Court holding that while the inference of malice may normally be drawn from use of a deadly weapon on a vital part of the victim's body, this inference will not be permitted to support a finding of malice where the evidence presented proves the contrary. *See Commonwealth v. Caye*, 465 Pa. 98, 101, 348 A.2d 136, 137 (1975). The trial court did not commit error by explaining to the jury the law as this Court has stated it, nor did the trial court shift the burden of proof to the defendant to disprove malice. Accordingly, the instant claim of ineffective assistance fails on its underlying merits.

## II. *PENALTY PHASE*

Appellant's first claim of ineffective assistance at the penalty phase repeats his guilt phase claims of ineffective assistance regarding trial counsel's failure to object to the trial court's instructions on reasonable doubt. This claim fails for the reasons stated in part I of this Opinion.

Next, appellant argues that trial counsel was ineffective for failing to object to the Commonwealth's use of appellant's conviction and death sentence for the murder of Steven Brown to establish the aggravating circumstance of a significant history of violent felony convictions. Specifically, appellant contends that his conviction and death sentence for the murder of Steven Brown were reversed after the sentencing hearing in this matter but prior to the direct appeal, and that the allegedly improper use of this faulty conviction by the Commonwealth should have been raised in the direct appeal. At the outset, it is useful to put appellant's claim in perspective. The Commonwealth used the following prior violent felony convictions of appellant in an attempt to substantiate the aggravating circumstance at issue:

(1) Appellant's January 31, 1985 conviction of the first-degree murder of James Reynolds;

(2) Appellant's March 7, 1986 conviction of the third-degree murder of Noble Green;

(3) Appellant's March 7, 1986 conviction of the aggravated assault of William Johnson, who suffered five gunshot wounds, one to the spine, and remained paralyzed and wheelchair-bound at the time of the sentencing proceeding here; and

(4) Appellant's July 21, 1986 conviction of the first-degree murder of Steven Brown.

N.T. 7/29/88 at 2727–59.

Although this Court did reverse appellant's conviction and death sentence for the murder of Steven Brown while appellant's direct appeal was pending, appellant subsequently pled guilty to the murder of Steven Brown. Thus, even if this Court were to order a new sentencing hearing, appellant's conviction for the killing of Steven Brown would still be available for the Commonwealth to use against appellant to establish the aggravating circumstance that appellant had a significant history of violent felony convictions, only this time the conviction would be based on a guilty plea instead of a jury's verdict. Hence, no prejudice can be established. Further, the vacating of appellant's original death sentence for the Steven Brown murder is irrelevant to the instant claim. The aggravating circumstance at issue is based solely on the convictions for prior violent felonies and is not based upon the types of sentences imposed for those convictions. Since appellant's *conviction* in the Steven Brown murder is presently intact, there is no basis on which to conclude that the jury in appellant's penalty phase improperly balanced his prior convictions when considering the aggravating circumstance of a significant history of violent felony convictions and the weight that should be attached to it. Accordingly, the instant claim fails on its underlying merits.[9]

9. We note that appellant raised a nearly identical claim on direct appeal, arguing that he was entitled to a new trial because the conviction for the Brown murder, which this Court subsequently reversed on

 Appellant's final claim is that trial counsel was ineffective for failing to object to the trial court limiting his presentation of mitigating evidence. Specifically, appellant contends that the trial court abused its discretion by sustaining objections to the following question when it was posed to appellant's mother and brother:

Q. What would be the impact on his getting the death penalty on your family?

N.T. at 2784 (mother) and 2787 (brother).

Appellant contends that by excluding this evidence, the trial court excluded evidence of "the depth of the love and need Petitioner had inspired in his mother and brother during his life." Appellant's Brief at 49. Assuming for the sake of argument that this question was relevant insofar as it arguably related indirectly to petitioner's character, we conclude nonetheless that the trial court did not abuse its discretion in sustaining objections to the question. The record is replete with testimony from the sentencing hearing concerning the impact a death sentence might have on appellant's family, as well as his character trait for "love." Sean Jones, appellant's brother, testified that if appellant was sentenced to death, it would have a "devastating" effect on his family and would be a significant "hardship" for appellant's mother. N.T. at 2775. Furthermore, Dorothy Murphy, Kenneth Murphy, and Sean Jones all testified to appellant's close relationships with his family, friends and children, and asserted that they all loved him very much. *Id.* at 2772–2788. An abundance of evidence was introduced from which the jury could deduce that there existed people in the world who would miss appellant if he were executed. Accordingly, we will not condemn as an abuse of discretion the trial court's sustaining of the objections to the foregoing question. Furthermore, as this issue arises in the context of an ineffective assistance claim, we conclude also that appellant has failed to meet his burden of establishing by

appeal, was admitted during the *guilt phase* of trial. However, as we stated in *Murphy, supra* at 329, 657 A.2d at 932–33, given his guilty plea after his initial conviction was reversed, his culpability for the killing remained intact and, therefore, no new trial was warranted.

a preponderance of the evidence that a different outcome would have been likely had he been permitted to introduce this strictly cumulative testimony. Accordingly, appellant's final claim of ineffective assistance fails.

In sum, we have thoroughly reviewed each of the claims presented by appellant and determined that he is entitled to no relief. Accordingly, we affirm the Order of the PCRA court.[10]

Justice NIGRO files a concurring opinion.

NIGRO, Justice, concurring.

I join in the majority opinion, but write separately to comment on Appellant's claim concerning the trial court's charge to the jury on the meaning of "reasonable doubt". As noted by the majority, the trial court informed the jury that all they could do was determine what "probably happened". Like the majority, I appreciate the fact that the trial court was attempting to explain to the jury that because they were not actually present during the commission of the crime, they could not know with absolute certainty exactly what happened. However, I cannot condone any language in a jury charge that suggests to the jury that they need not find the defendant guilty beyond a reasonable doubt in order to convict him of the crimes charged. By injecting language such as "probably happened" into a jury charge on the meaning of "reasonable doubt", a trial court necessarily risks diluting the "beyond a reasonable doubt" standard. Nevertheless, because I agree with the majority that the trial court's charge in the instant case, as a whole, adequately instructed the jury on the meaning of "reasonable doubt", I agree that the Appellant's ineffectiveness claim does not entitle him to relief.

---

10. Pursuant to 42 Pa.C.S. § 9711(I), the Prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor of Pennsylvania within 90 days.