938 A.2d 362

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Edwin Rios ROMERO, Appellant.**

Supreme Court of Pennsylvania.

Submitted Aug. 1, 2001.

Decided Dec. 28, 2007.

282

284

Alexandra B. Fensterer, Norman, OK, Christina Allison Swarns, New York, NY, James Moreno, Philadelphia, Victor J. Abreu, for Edwin Rios Romero.

Theodore Rafael Racines, Allentown, Robert A. Graci, Harrisburg, Christopher D. Carusone, Philadelphia, James B. Martin, Esq., and Amy Zapp, for Com., appellee.

BEFORE CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN, FITZGERALD, JJ.

## *OPINION*

Justice EAKIN.

Appellant appeals from the order denying him relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. We affirm.

Appellant was convicted of the first degree murder of David Bolasky, who was lured to Miguel Moreno's apartment in Allentown under the pretense Moreno intended to pay him rent money. Bolasky was attacked and killed inside the apartment by appellant, George Lopez, and Jorge Barbosa. Moreno was not present during the killing, but implicated himself, Lopez, Barbosa, and appellant when he confessed to the police.

Barbosa confessed to Captain Anthony Bucarey and implicated appellant, Lopez, and Moreno. Barbosa stated he struck Bolasky on the head with a pistol, and he, appellant,

and Lopez took turns tightening a towel around Bolasky's neck until he was dead. Bolasky's body was hog-tied, wrapped in bed sheets, carried out of the apartment building, and loaded into Bolasky's van. Appellant, Lopez, and Barbosa drove to a desolate area, dumped the body, and abandoned the van. Bolasky's hog-tied body was subsequently found wrapped in bed sheets along a secluded road. Barbosa pled guilty and received a life sentence.

Appellant and Lopez were tried jointly. During the guilt phase, Barbosa testified about the involvement of Lopez and Moreno in the killing, but refused to answer questions regarding appellant's involvement. Despite being held in contempt of court, Barbosa refused to answer questions regarding his prior statements as they related to appellant. The trial court permitted Captain Bucarey to read Barbosa's transcribed statement from the tape-recorded police interview which explicitly implicated appellant in the murder.[1] Moreno also testified, implicating appellant in the crime. Appellant's cellmate, Daniel Lopez, testified appellant admitted to him the facts of his involvement in the robbery and murder.

The jury found appellant guilty of first degree murder and returned a verdict of death after finding four aggravating circumstances and no mitigating circumstances.[2] On direct

1. On direct appeal, this Court concluded the trial court erred in admitting Barbosa's prior statements, thus violating appellant's Confrontation Clause rights; however, we found the error was harmless because the evidence was merely cumulative of substantially similar, properly admitted evidence, namely, the testimony of Moreno and Daniel Lopez. *Commonwealth v. Romero*, 555 Pa. 4, 722 A.2d 1014, 1016 (1999).

2. The jury found the following aggravating circumstances: "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses[,]" 42 Pa.C.S. § 9711(d)(5); "[t]he defendant committed a killing while in the perpetration of a felony[,]" *id.*, § 9711(d)(6); "[t]he defendant has a significant history of felony convictions involving the use or threat of violence to the person[,]" *id.*, § 9711(d)(9); and "[t]he defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503 ..., or a substantially equivalent crime in any other jurisdiction, committed either before or at the time of the offense at issue." *Id.*, § 9711(d)(12).

appeal, this Court affirmed the judgment of sentence. *Commonwealth v. Romero,* 555 Pa. 4, 722 A.2d 1014 (1999). The United States Supreme Court denied *certiorari. Romero v. Pennsylvania,* 528 U.S. 952, 120 S.Ct. 376, 145 L.Ed.2d 293 (1999). On October 25, 1999, appellant filed a *pro se* PCRA petition and received appointed counsel, who filed an amended petition. Following a hearing, the PCRA court denied appellant's petition. Appellant now appeals, raising 25 issues for our review.[3]

■ In reviewing an order granting or denying post conviction relief, we examine whether the PCRA court's determination is supported by the evidence and whether it is free of legal error. *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1176 (1999). To be entitled to relief under the PCRA, appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, *id.,* § 9543(a)(3), and "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.,* § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue . . . ." *Id.,* § 9544(a)(2).

Several of the issues underlying appellant's ineffectiveness claims were addressed on direct appeal; specifically, we addressed the admission of Barbosa's prior police statement and noted there was sufficient evidence to support the aggravating circumstances. *Romero,* at 1016–19, 1021 n. 8. However, appellant now alleges counsel's ineffectiveness in connection with these issues; therefore, his issues are distinct from those raised on direct appeal and have not been previously litigated. *See Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 570, 573 (2005) (term "issue" as used in §§ 9543(a)(3) and 9544(a)(2) "refers to the discrete legal ground that was for-

---

**3.** Appellant's issues have been reordered for ease of discussion.

warded on direct appeal and would have entitled the defendant to relief . . . ."; ineffectiveness claims are distinct from claims raised on direct appeal, and must be treated as wholly independent of underlying claim of error).

█ Regarding waiver, we note none of appellant's issues were raised at trial or on direct appeal;[4] thus, the underlying claims of trial error were waived. 42 Pa.C.S. § 9544(b). However, appellant may still obtain relief if he can show appellate counsel was ineffective for failing to pursue the claims of trial counsel's ineffectiveness. *See Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 656 (2003) (citing *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1022 (2003) (when court is faced with "layered" ineffectiveness claim, only viable ineffectiveness claim is that related to most recent counsel, appellate counsel)).

█ To preserve a "layered" ineffectiveness claim,

a petitioner must *"plead,* in his PCRA petition," that appellate counsel was ineffective for failing to raise all prior counsel's ineffectiveness. Additionally, a petitioner must *"present* argument on, i.e. develop each prong of the [*Commonwealth v.] Pierce* [, 515 Pa. 153, 527 A.2d 973 (Pa.1987) ] test" as to appellate counsel's deficient representation. . "Then, and only then, has the petitioner preserved a layered claim of ineffectiveness for the court to review; then, and only then, can the court proceed to determine whether the petitioner has proved his layered claim."

---

**4.** *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002) abrogated the rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where appellant has new counsel, *see Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977), and instead held a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant,* at 738. At the time of appellant's trial, direct appeal, and PCRA proceedings, however, *Grant* was not decided, and therefore, on direct appeal appellant was required to raise his claims of trial counsel's ineffectiveness in order to avoid waiver; having failed to raise them on direct appeal, he was required to layer them by alleging the ineffectiveness of both trial and appellate counsel in his PCRA petition. *See Hubbard,* at 695 n. 6.

*Id.,* at 656 (citations and footnote omitted) (emphasis in original); *see also McGill,* at 1021–23.

■ The *"Pierce* test" requires appellant to prove, with respect to appellate counsel's performance, that: (1) the underlying claim of trial counsel's ineffectiveness has arguable merit;[5] (2) appellate counsel had no reasonable basis for failing to pursue the claim; and (3) but for appellate counsel's ineffectiveness, the result on direct appeal would have differed. *See McGill,* at 1022–23. This "performance and prejudice" test was first enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and was recognized in *Pierce* as the proper test under the Pennsylvania Constitution. Failure to establish any prong of the test will defeat an ineffectiveness claim. *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000) (citing *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 441 (1999) (ordinarily, post conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet any one of three prongs for claim)).

Appellant has met the pleading requirement. In his PCRA petition, he properly pled appellate counsel's ineffectiveness for not raising trial counsel's ineffectiveness for failing to challenge the alleged errors at trial. *See Commonwealth v. Chmiel,* 536 Pa. 244, 639 A.2d 9, 12 (1994) (ineffectiveness claim must be raised at earliest stage at which counsel whose stewardship is being challenged no longer represents appellant). In his brief, appellant discusses trial counsel's ineffectiveness and includes a sentence concerning appellate counsel's ineffectiveness in connection with each issue; he attempts to overcome waiver with a catch-all, boilerplate assertion of all prior counsel's ineffectiveness for failing to litigate these issues. *See* Appellant's Brief, at 3, 99–100. He also presents argument concerning his underlying claims of trial error and

5. An assessment of this prong requires appellant to establish each *Pierce* prong with respect to trial counsel's performance. This "merit" prong has been referred to as containing a "nested" argument-trial counsel's performance must be addressed in order to determine whether appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. *See Rush,* at 656.

trial counsel's ineffectiveness, satisfying the first prong of *Pierce* with respect to appellate counsel. However, he fails to develop the remaining two prongs concerning appellate counsel's stewardship; thus, he has failed to preserve his claims of appellate counsel's ineffectiveness as required by *McGill.*

In cases where the appellant has established the arguable merit of his underlying claim of trial counsel's ineffectiveness, thus establishing the first prong of *Pierce* with respect to appellate counsel, remand may be warranted for the opportunity to develop the remaining two prongs regarding appellate counsel's ineffectiveness. *Rush,* at 657. "Nevertheless, there is simply no need to remand a PCRA petition when the petitioner has not carried his *Pierce* burden in relation to the underlying claim of trial counsel's ineffectiveness, since even if the petitioner were able to craft a perfectly layered argument in support of his claim, the petitioner's claim would not entitle him to relief." *Id.,* at 657–58. Thus, we need not remand if appellant has not met his burden of proving the underlying claim of trial counsel's ineffectiveness.

As discussed below, appellant has not demonstrated his entitlement to relief on any of these underlying claims. Since all of appellant's underlying claims of trial counsel's ineffectiveness fail, his claims of appellate counsel's ineffectiveness are necessarily defeated as well. *McGill,* at 1023. Therefore, we need not remand in order for him to develop the remaining two prongs of *Pierce* with respect to appellate counsel. *See Rush,* at 657–58; *McGill,* at 1026. We now turn to address appellant's claims.

*Whether appellant's conviction must be reversed because the trial was not commenced within the time constraints of the interstate agreement on detainers.*

█ Appellant argues the charges against him should have been dismissed because he was not tried within 120 days of his arrival in Pennsylvania from Puerto Rico, as required by the Interstate Agreement on Detainers (IAD), 42 Pa.C.S. § 9101, art. IV(c). Appellant was sentenced to imprisonment in Puerto Rico for an unrelated offense two months after Bolasky's murder and brought to Pennsylvania two months later to face

the instant charges; however, his trial did not commence until 250 days after his arrival. He claims this delay prejudiced him because much of the evidence used to procure his conviction was obtained after the 120–day period.

At appellant's PCRA hearing, trial counsel testified appellant was not brought to Pennsylvania under the IAD; the Commonwealth attempted to get a detainer for him under the IAD but was informed by the Governor's Office that it could not proceed under the IAD because appellant was in Puerto Rico.[6] N.T. PCRA Hearing, 5/31/00, at 766. Instead, the Commonwealth brought appellant to Pennsylvania pursuant to an executive agreement signed by the Governors of Pennsylvania and Puerto Rico. *Id.*, at 766–67. Once appellant was in Pennsylvania, the trial schedule was established by consensus between the Commonwealth and counsel for the defendants. *Id.*, at 681–82. Trial counsel testified he did not challenge the time in which appellant was brought to trial because he felt it would be disingenuous to argue the time limits had run when he originally agreed to the schedule. *Id.* Accordingly, appellant's underlying claim of trial counsel's ineffectiveness fails, and remand is unnecessary for development of his claim of appellate counsel's ineffectiveness. *See McGill,* at 1026.

*Whether appellant was denied his right to a fair trial where all proceedings were conducted in English, which appellant was unable to meaningfully understand, and without translation by an interpreter.*

■ Appellant claims he was denied a fair trial because trial was conducted in English and, as a native Spanish-

6. The parties disagree regarding whether Puerto Rico has adopted the IAD. *See* Appellant's Brief, at 64 (citing *Commonwealth v. Montione,* 554 Pa. 121, 720 A.2d 738, 740 (1998) (stating IAD is agreement between 48 states, District of Columbia, Puerto Rico, and Virgin Islands)); Commonwealth's Brief, at 47 n. 27 (arguing *Montione's* statement is *dicta,* based on misstatement in *dicta* in *Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985)); *see also* PCRA Court Opinion, 9/15/00, at 23 (stating Puerto Rico has not adopted IAD). *But see Commonwealth v. Williams,* 586 Pa. 553, 896 A.2d 523, 536 n. 5 (2006) (IAD is agreement between 48 states, District of Columbia, Puerto Rico, and Virgin Islands). Because the IAD was not used to bring appellant to Pennsylvania, and in light of the fact that trial was scheduled by mutual consensus, we need not address this conflict.

speaker, he was not provided an interpreter when he "was unable to meaningfully speak, read or understand the English language." Appellant's Brief, at 15. This Court has stated:

A defendant's ability to use an interpreter encompasses numerous fundamental rights. The failure to understand the proceedings may deny him his right to confront witnesses against him, his right to consult with his attorney, or his right to be present at his own trial. The use of an interpreter may also be necessary to protect appellant's right to testify in his own behalf.

\* \* \*

The decision to use an interpreter rests in the sound discretion of the trial judge. This is necessary because numerous factors such as the complexity of issues and testimony and the language ability of the defendant must be taken into consideration. However, in view of the important rights involved, the trial court must consider all relevant factors in its initial determination of need. If it becomes apparent that an interpreter is necessary during the trial, the court should, on its own motion or on motion of a party, make an interpreter available.

*Commonwealth v. Pana,* 469 Pa. 43, 364 A.2d 895, 898 (1976) (citations omitted).

Trial counsel testified although he had an interpreter present during his first meeting with appellant, it was clear to him appellant understood enough English to communicate with counsel; if there was a word or phrase appellant did not understand, counsel would explain it in simpler terms. N.T. PCRA Hearing, 5/31/00, at 639–42, 684–85. Counsel further testified he and appellant discussed having an interpreter at trial, but he thought it might create a racial bias against appellant, as there was some racial animus against Hispanics in the community; he feared if appellant spoke in Spanish at times and in English at others, the jury would eye this with suspicion. *Id.,* at 642–43. Counsel advised appellant if there ever came a point in trial that he felt he needed an interpreter, one would be provided, but counsel felt, based on his

conversations with appellant, that appellant would be able to proceed without one.[7] *Id.*, at 643–44.

This testimony was corroborated by Detective Joseph Hanna, who testified although he initially was under the impression appellant did not speak English well, appellant initiated and sustained two conversations with him in English. N.T. PCRA Hearing, 6/1/00, at 939–48. Finally, appellate counsel testified his review of the transcript did not lead him to believe appellant had expressed he did not understand the proceedings, and therefore he had not raised the issue. N.T. PCRA Hearing, 5/31/00, at 738. The PCRA court found all of this testimony credible, and concluded at the time of trial, appellant was able to communicate in English and comprehend the proceedings in English. *See Commonwealth v. Carson,* 559 Pa. 460, 741 A.2d 686, 693 (1999) (credibility issues solely within province of fact-finder). Accordingly, appellant's underlying claim fails, and there is no need to remand for development of the remaining two prongs concerning appellate counsel. *See McGill,* at 1026.

*Whether the trial court failed to take protective measures to combat the sustained, pervasive, and inflammatory pre-trial and trial publicity.*

■ Appellant claims the trial court and counsel failed to take appropriate measures to combat inflammatory publicity about his case, both pre-trial and during trial. He argues it was impossible to empanel an impartial jury because of the extensive newspaper articles, as well as radio and television coverage, which continually emphasized his dangerousness and criminal history, as well as presented facts about the victim that would have been inadmissible at trial. Appellant points out that 76 of the 110 venire members stated they knew about the case from the media, and 11 of the 12 jurors empaneled, as well as three of the four alternates, were familiar with the case. Appellant's Brief, at 85–86. He contends the trial court's instructions to the venire members during *voir dire* were insufficient to protect his right to an impartial jury, and

7. Counsel did request an interpreter to stand by appellant during his penalty phase testimony. N.T. Trial, 3/20/96, at 18–19, 76, 80.

its questioning of them was superficial and inconsistent; therefore, counsel should have demanded a change of venue or venire, and the trial court should have moved the trial or sequestered the jury.

■ Appellant argues the media publicity was presumptively prejudicial. However, "[t]he mere existence of pretrial publicity does not warrant a presumption of prejudice." *Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96, 103 (1996). This Court noted, in determining whether pre-trial publicity was inherently prejudicial:

> [O]ur inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity. Pre-trial publicity will be deemed inherently prejudicial where the publicity is sensational, inflammatory, slanted towards conviction rather than factual and objective; revealed that the accused had a criminal record; referred to confessions, admissions or re-enactments of the crime by the accused; or derived from reports from the police and prosecuting officers.

*Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 213 (1997) (quoting *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 450 (1995)).

> If any of these factors exists, the publicity is deemed to be inherently prejudicial, and we must inquire whether the publicity has been so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it. Finally, even if there has been inherently prejudicial publicity which has saturated the community, no change of venue is warranted if the passage of time has significantly dissipated the prejudicial effects of the publicity.

*Chambers*, at 103 (citations omitted).

The record reveals all 12 jurors selected for appellant's trial were asked about their knowledge of the case from the media; of those who were familiar with it, none had formed a fixed opinion of appellant's guilt or innocence. *See* N.T. *Voir Dire*, 3/4/96, at 141, 260; N.T. *Voir Dire*, 3/5/96, at 16, 21, 58, 117–

19, 127–31, 258–59, 346, 355, 415–16, 423–26; N.T. *Voir Dire,* 3/6/96, at 101–02, 107, 108–09, 195–96, 246–47, 400–01. Thus, appellant was not denied his right to an impartial jury, and remand is unnecessary for him to develop his claim of appellate counsel's ineffectiveness. *See McGill,* at 1026.

*Whether appellant's venire, and hence his petit jury, was not representative of a fair cross-section of the community.*

■■■■ Appellant contends his jury was not selected from a fair cross-section of the community; he claims Lehigh County's jury selection procedures resulted in the exclusion of Hispanic and African–American jurors from the venire. To establish a *prima facie* case that a jury pool selection method violates the Sixth Amendment, appellant must show:

> 1) the group allegedly excluded is a distinctive group in the community; 2) representation of this group in the pool from which juries are selected is unfair and unreasonable in relation to the number of such persons in the community; and 3) the under-representation is due to the systematic exclusion of the group in the jury selection process.

*Commonwealth v. Lopez,* 559 Pa. 131, 739 A.2d 485, 495 (1999) (citing *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

At the PCRA hearing, trial counsel testified he did "not really" recall the jury selection proceedings, N.T. PCRA Hearing, 5/31/00, at 611, but that to his knowledge, there were no jury members with Hispanic names on appellant's jury, nor were there any African–Americans. *Id.* He recalled "maybe one or two" African–Americans in a jury pool of approximately 100. *Id.,* at 611–12. He stated the Hispanic population in Allentown is approximately 6% of 100,000–110,000, *id.,* at 612, 618, so he would have expected a larger percentage of Hispanics on the panel. *Id.,* at 618. However, he was unable to give statistics regarding the Hispanic and African–American population of Lehigh County as a whole, from which the jury pool was selected.

The prosecutor testified regarding Lehigh County's jury selection process; PennDOT sends the county a list of all

licensed drivers residing in the county, and a computer randomly selects names from the list. *Id.,* at 776. There is no way for the system to include or exclude venire persons based on race or gender. *Id.,* at 776–77.

In *Lopez,* appellant's co-defendant raised a similar challenge on direct appeal, claiming the jury selection process systematically excluded the elderly, the poor, and the handicapped. *Lopez,* at 494. This Court concluded Lopez failed to offer statistical proof these classes were under-represented in Lehigh County's selection process. *Id.,* at 495. Likewise, appellant failed to offer statistical evidence regarding Lehigh County's racial composition. Furthermore, as observed in *Lopez,* Lehigh County's selection method provided a greater number of prospective jurors than were contained in the county's voter registration list, which is listed as an acceptable means of selection in 42 Pa.C.S. § 4521(a)(2). *Lopez,* at 494 n. 13. Thus, Lehigh County's method of jury selection is statutorily permissible, and appellant has failed to demonstrate a violation of his Sixth Amendment right to an impartial jury. Accordingly, remand is unnecessary for further development of this claim. *See McGill,* at 1026.

*Whether appellant was unconstitutionally tried while incompetent.*

 Appellant claims he was tried while incompetent. He argues the testimony of two experts who testified at the PCRA hearing established he is borderline mentally retarded, brain damaged, and mentally ill; he claims these factors, combined with the fact he was not provided an interpreter and was forced to wear a stun belt during trial, rendered him incompetent.

Pursuant to 50 P.S. § 7402(a), a person is incompetent to stand trial when he is substantially unable to understand the nature or object of the proceedings against him or to participate in his own defense. As previously discussed, appellant's claim concerning the lack of an interpreter is meritless; his claim concerning the stun belt is also meritless, as discussed *infra.* Thus, we turn to the expert testimony at the PCRA

hearing, as it is the only evidence which may support appellant's claim.

Appellant presented the testimony of two experts; the Commonwealth presented one expert. Although all of the experts testified extensively concerning appellant's capacity to form specific intent, his low level of intelligence, and whether he had organic brain syndrome, none of them testified that any mental deficiency possessed by appellant would have prevented him from understanding what his trial was about or from cooperating with trial counsel. Furthermore, trial counsel testified "there was never any question in [his] mind that ... [appellant] knew and could participate in his defense." N.T. PCRA Hearing, 5/31/00, at 660. Thus, appellant's claim is meritless, and there is no need to remand for development of this claim. *See McGill*, at 1026.

*Whether appellant was improperly forced to wear a stun belt during his trial.*

Appellant claims wearing a stun belt at trial prejudiced him in the jury's eyes and constituted cruel and unusual punishment. He argues there was no showing of necessity for him to wear the belt, and the Commonwealth failed to show less restrictive means of restraining him were unavailable. He further contends wearing the belt deprived him of his ability to communicate with counsel and placed him "under significant, unfair and prejudicial psychological pressure," Appellant's Brief, at 94, such that he was unable to participate in his defense. He claims wearing the belt during his testimony at the penalty phase interfered with his right to testify and his right against self-incrimination.

Trial counsel and the prosecutor both testified the stun belt was not visible to the jury; it was underneath appellant's clothes. N.T. PCRA Hearing, 5/31/00, at 665, 768. The jury could not have been prejudiced by what it could not see. Further, there was no testimony presented which would support appellant's assertion that the belt psychologically hindered him from fully participating in his trial. As this claim

lacks merit, remand for further development of it is unnecessary. *See McGill*, at 1026.

*Whether appellant is entitled to relief from his conviction and sentence because he is actually innocent and his conviction and death sentence are the product of false testimony, government misconduct and overreaching, and ineffective assistance of counsel.*

■ Appellant claims his conviction and death sentence must be overturned because he is innocent and because they were the product of government misconduct, false testimony, and ineffective assistance of counsel. The crux of his argument is that the trial testimony of Barbosa and Moreno, which was the mainstay of the Commonwealth's case, was coerced by the police and was false, as evidenced by these witnesses' subsequent recantation at appellant's PCRA hearing. Appellant further argues trial and appellate counsel were ineffective for failing to discover and present this recantation evidence.

■ To be entitled to a new trial on the basis of recantation evidence, "the testimony must be such that it could not have been obtained at the time of trial by reasonable diligence; must not be merely corroborative or cumulative; cannot be directed solely to impeachment; and must be such that it would likely compel a different outcome of the trial." *Williams*, at 1180 (citing *Commonwealth v. McCracken*, 540 Pa. 541, 659 A.2d 541, 545 (1995)) (citations omitted).

This Court has stated:

Recantation testimony is extremely unreliable. When the recantation involves an admission of perjury, it is the least reliable form of proof. The trial court has the responsibility of judging the credibility of the recantation. Unless the trial court is satisfied that the recantation is true, it should deny a new trial. An appellate court may not disturb the trial court's determination absent a clear abuse of discretion.

*Commonwealth v. Henry*, 550 Pa. 346, 706 A.2d 313, 321 (1997) (citations omitted).

Appellant reasserts his version of the "pizza shop story" is true; he claims he was in the pizza shop across the street from the apartment where the murder took place, had no part in the planning or commission of the crime, and is thus innocent. This was the defense theory at trial, and the jury rejected it. At appellant's PCRA hearing, Barbosa and Moreno recanted their prior testimony implicating appellant, instead adopting their own versions of the pizza shop story in an attempt to exculpate appellant.

Barbosa testified he did not testify at trial with reference to appellant because he did not want to continue to lie about appellant's involvement. N.T. PCRA Hearing, 5/26/00, at 217–18. Barbosa testified appellant was not present during the murder, but rather, stayed behind in a nearby pizzeria where the other men involved had formulated the plan to rob Bolasky. *Id.*, at 205.

Moreno, who made statements to the police implicating appellant in the murder, testified his earlier statements were false. *Id.*, at 305, 312. Moreno testified he did not see appellant inside the apartment, but thought he might remember appellant coming down the stairs of the building. *Id.*, at 307–08. Moreno testified he only remembered seeing appellant outside in front of the apartment building after the murder. *Id.*, at 332.

The PCRA judge, who also presided at appellant's trial, did not find the recantation testimony of these witnesses credible:

Because I presided at the trial of the Defendant, as well as at the PCRA hearing, I had the opportunity to observe the testimony of Barbosa and Moreno both times. It is my finding that both Barbosa and Moreno were untruthful when giving their recantation testimony at the PCRA hearing. Counsel for the Commonwealth and for the Defendant have outlined the motives, or lack thereof, for Barbosa and Moreno to have lied at the PCRA hearing. Whether the motive to lie came from friendship, from peer pressure, from a desire for status in the prison community, or for

some other reason is immaterial to my finding. It was clear from the content of the PCRA testimony as well as its manner of delivery that both individuals lied in order to attempt to save the Defendant from the sentence of death.

PCRA Court Opinion, 9/15/00, at 3. It is the fact-finder's function to resolve inconsistencies and conflicts in testimony, *Commonwealth v. Smith*, 490 Pa. 329, 416 A.2d 494, 496 (1980), and credibility issues are solely within the province of the fact-finder. *Carson*, at 693. Where a PCRA court's credibility determination is supported by the record, it is binding on the reviewing court. *Commonwealth v. White*, 557 Pa. 408, 734 A.2d 374, 381 (1999). The PCRA court, having heard these witnesses' testimony and observed their demeanor at both trial and the PCRA hearing, concluded their statements implicating appellant were reliable and credible. We find no abuse of discretion by the PCRA court; therefore, we will not disturb its credibility determinations.[8]

Appellant further claims Barbosa and Moreno's statements implicating him were the product of police coercion, and the Commonwealth presented this evidence in reckless disregard for its truth or falsity when it did not administer polygraph tests to these witnesses. The statements these witnesses gave, however, were prompted by the polygraph; Moreno gave his statement when faced with the prospect of having to take a polygraph after giving police several versions of his story, and Barbosa gave his statement after he failed the polygraph, having told police the pizza shop story. The only inconsistency in Moreno's stories was his own level of involvement; with each new version, he confessed to a greater level of complicity. The reason Barbosa gave for his subsequent refusal to testify after he had implicated appellant was he did not want to lie, N.T. PCRA Hearing, 5/26/00, at 217–18; however, the PCRA hearing testimony of the police revealed Barbosa and appellant had a prior relationship, having escaped from jail together in Puerto Rico. N.T. PCRA Hearing,

8. Appellant also challenges the veracity of his cellmate, Daniel Lopez's, testimony. For the same reasons discussed above with respect to the testimony of Moreno and Barbosa, this claim is meritless.

6/1/00, at 967–68. Barbosa, who was serving life in prison and had nothing to gain by testifying at appellant's trial, feared retaliation against his family by appellant's supporters in Puerto Rico. *Id.*, at 965–66. Thus, there is nothing in the record to support appellant's allegation of government misconduct. Accordingly, appellant's ineffectiveness claims fail, as there is no merit to his underlying claims of innocence or government misconduct,[9] and we need not remand for development of his claim concerning appellate counsel's ineffectiveness. *See McGill,* at 1026.

*Whether the admission of the inadequately redacted statement of appellant's non-testifying co-defendant, at their joint trial, violated appellant's constitutional rights.*

Appellant claims the admission of Lopez's inadequately redacted statement at their joint trial violated his Sixth Amendment confrontation rights and *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (non-testifying co-defendant's confession that expressly names another co-defendant is inadmissible at joint trial). Lopez did not testify at trial, but appellant's cellmate testified regarding the contents of a written statement Lopez had shown him.[10] In the statement, Lopez said he and appellant were in a pizza shop when Moreno committed the murder, and Lopez and appellant merely helped dispose of the body. *See* N.T. Trial Vol. IV, 3/12/96, at 125–27, 150–52. The statement supported the Commonwealth's argument that appellant and Lopez conspired to fabricate a false inculpatory statement while they were in prison, minimizing their involvement in the crime, *see* N.T. Trial, 3/19/96, at 92–96; it was introduced first against Lopez, then against appellant. When read against Lopez,

9. Also, with regard to trial counsel's ineffectiveness, this argument is illogical. Although Barbosa recanted his testimony at trial, appellant is primarily arguing Barbosa and Moreno recanted their testimony at the PCRA hearing. Accordingly, trial counsel cannot be ineffective for testimony presented by a witness five years after the trial. The same is true of counsel on direct appeal.

10. The written statement was never introduced into evidence; the cellmate reiterated its contents, having been told not to mention one co-defendant's name when talking about the other. N.T. Trial Vol. IV, 3/12/96, at 132.

appellant's name was redacted and replaced with "the other guy"; when read against appellant, Lopez's name was redacted and replaced with "the other guy." Appellant claims the effect of the redaction of his name was vitiated by the subsequent redaction of Lopez's name; presenting both versions of the statement made it clear the cellmate was referring to appellant and Lopez.[11]

Contrary to appellant's contention, the pizza shop story Lopez told the cellmate was not introduced for its truth. *See* N.T. Trial, 3/19/96, at 92 ("[Daniel Lopez] was not testifying that this story is true. He was testifying, 'This is what they had me write out for them. . . .' He was not saying that that's true."). Rather, it was admitted to show appellant and Lopez's consciousness of guilt, *i.e.*, they would not have fabricated a story to minimize their involvement had they not been guilty. *See id.*, at 96 ("There's a reason to remove oneself from criminal responsibility and faults. There's a reason to fabricate evidence and minimize [their] involvement. And the reason is the same reason we talked about before. Because they're guilty."). Thus, the statement was not hearsay. *See* Pa.R.E. 801 (hearsay is statement offered to prove truth of matter asserted). A defendant's right to confrontation is not implicated when the prosecution introduces a co-defendant's incriminating statement for a non-hearsay purpose; the truth of the statement is not implicated. *See Lopez*, at 506–07 (Saylor, J., concurring) (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (defendant's Confrontation Clause rights not violated by introduction of

---

11. Lopez raised an identical claim concerning this testimony. *See Lopez*, at 496–500. This Court, while not specifically ruling on whether the statements violated *Bruton*, held counsel had a reasonable basis for not objecting to the references to Lopez as "the other guy," and Lopez failed to establish he was prejudiced by the admission of the statements. *Id.*, at 498–99. We further held another portion of the testimony to which Lopez objected fell under the admission by party opponent exception to the hearsay rule. *Id.*, at 499. Justice Saylor concurred, joined by then-Justice Zappala and Justice Cappy, noting he would hold the Confrontation Clause was not implicated by the cellmate's testimony because it was introduced not for its truth, but instead to show fabrication as consciousness of guilt, and as such, was not hearsay. *See id.*, at 505–07 (Saylor, J., concurring).

accomplice's confession for nonhearsay purpose of rebutting defendant's testimony that his confession was coerced)). As the pizza shop story was not introduced for its truth, it was not hearsay, and appellant's confrontation rights were not implicated. Therefore, remand for development of this meritless claim is unnecessary. *See McGill,* at 1026.

Appellant further claims reading both versions of Lopez's statement made it clear another redacted statement by Lopez, read into evidence by a police detective, also referenced appellant. The detective read portions of a February 10, 1995 police interview with Lopez, in which appellant's name was redacted and replaced with "the other guy." *See* N.T. Trial, 3/18/96, at 186, 189, 193–94, 199, 201–04, 211, 216–20. As with Lopez's written statement to the cellmate, Lopez's statements in the police interview were not introduced for their truth; the three interviews showed Lopez's deviation from his initial version of events in earlier interviews and his inconsistency in relating the "facts" of the murder to the police. *See* N.T. Trial, 3/19/96, at 107–10 (prosecutor's closing statement contrasted Lopez's different versions of how murder occurred); *id.,* at 110 ("I submit to you, you also know why George Ivan Lopez is lying. Because he's guilty and he doesn't want to be found out. George Ivan Lopez's lies are indications of his guilt."). Because Lopez's statements were introduced not for their truth, but rather to show he fabricated the stories because he was guilty, appellant's confrontation rights were not implicated. This claim is meritless; therefore, remand is unnecessary. *See McGill,* at 1026.

*Whether the Commonwealth improperly introduced irrelevant and inflammatory victim impact evidence.*

 Appellant claims the Commonwealth improperly introduced victim impact evidence [12] during the guilt phase when

12. Victim impact evidence is "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim...." 42 Pa.C.S. § 9711(a)(2). On October 11, 1995, § 9711(a)(2) was amended to permit victim impact evidence to be admitted in the penalty phase. The amendment, which took effect 60 days thereafter, applies only to sentences imposed for offenses which took place on or after its effective date; thus, at the time of appellant's

certain witnesses [13] testified regarding the victim's background and character; appellant claims this evidence, which was inflammatory, also tainted the penalty phase because the jury was never given a curative or limiting instruction.

Evidence introduced to result in sympathy for the victim's family, while having no direct relationship to the facts and circumstances of the crime, is impermissible during the guilt phase of trial. *See Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 159 (1978). Contrary to appellant's claim, the testimony of these witnesses was introduced as evidence establishing a link to the crime. One of the victim's co-workers testified about a bonus check the victim received on the day of the murder that was never recovered from his belongings, thus supporting the charges of theft, robbery, and receiving stolen property. Another co-worker testified about what the victim was wearing when last seen and described the victim's briefcase, which matched the description of one later discarded by Barbosa. The witness who found the victim's discarded wallet, which was crucial in later locating the victim's body, recounted how she tried to return it, only to learn the victim was dead; she then gave it to police. The police chief testified regarding the missing person investigation and the discovery of the body. The victim's wife testified about what her husband was wearing when last seen and identified his discarded belongings. All of this testimony was relevant in establishing the chain of events and linking the defendants to the crime. As such, there was no error in admitting it, and remand to develop this claim is unwarranted. *See McGill*, at 1026.

trial, victim impact evidence was inadmissible during both guilt and penalty phases. *See Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 145–47 (1996).

13. Appellant cites the testimony of the victim's co-workers, Nancy Miltenberger, Louis Leposa, and Ken Zimmerman; Lorelei Willgruber, who found the victim's wallet; Police Chief Larry Boyer; and Brenda Bolasky, the victim's wife. *See* Appellant's Brief, at 43.

*Whether the jury instructions unconstitutionally relieved the Commonwealth of its burden of proving every element of each offense beyond a reasonable doubt.*

 Appellant argues the jury instructions unconstitutionally relieved the Commonwealth of its burden of proving every element of each offense beyond a reasonable doubt. The trial court defined "reasonable doubt" as a doubt that "would cause a reasonably, careful and sensible person, to pause, hesitate or *refrain from acting* upon a matter of highest importance in his or her own affairs or to his or her own interests." N.T. Trial, 3/19/96, at 155–56 (emphasis added). Appellant claims the "refrain from acting" formulation requires a higher level of doubt than is required by due process; Pennsylvania Suggested Standard Criminal Jury Instruction 7.01(3) defines a "reasonable doubt" as one "that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs." Pa.S.S.J.I. (Crim.) 7.01(3). Appellant also alleges the trial court told the jury Barbosa's prior inconsistent statement could be regarded as proof of the facts in the statement; he argues this instruction relieved the Commonwealth of its burden and invaded the jury's fact-finding function. Finally, appellant asserts the accomplice and co-conspirator liability instructions relieved the Commonwealth of its burden of proving he possessed specific intent to kill.

A trial court has broad discretion in phrasing its instructions to the jury and can choose its own wording so long as the law is clearly, adequately and accurately presented to the jury for consideration.... In reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, in order to ascertain whether the instruction fairly conveys the legal principles at issue.

*Commonwealth v. Gibson,* 553 Pa. 648, 720 A.2d 473, 481 (1998) (citations omitted).

 Appellant isolates the "refrain from acting" portion of the reasonable doubt charge without reading it in the context of the entire charge; the trial court prefaced this phrase with

"pause, hesitate," and thus did not restrict the definition to only those doubts that would preclude one from acting at all. This Court has approved of similar instructions on reasonable doubt. *See Commonwealth v. Murphy,* 559 Pa. 71, 739 A.2d 141, 146–47 (1999) ("reasonable doubt" is one that would "cause a prudent, careful and sensible person to pause, hesitate, restrain himself or herself before acting upon a matter of the highest importance in his or her affairs"). The language used herein is not a variation that warrants reversal.

Similarly, appellant reads a portion of the instruction regarding Barbosa's prior statement in isolation; the charge, in its entirety, stated: "You *may, if you choose,* regard this evidence as proof of anything that the witness said in the earlier statement." N.T. Trial, 3/19/96, at 166 (emphasis added). Although this Court concluded on direct appeal that Barbosa's prior statement was erroneously admitted, *see Romero,* at 1016, the instructions given on it were proper. Contrary to appellant's contention, the court did not direct the jury to regard Barbosa's statement as proof, but rather that the jury could do so if it so chose. The province of the jury was not invaded, nor was the Commonwealth's burden of proof diluted.

Appellant's claim that the conspirator and accomplice liability instructions negated the requirement the Commonwealth prove he possessed specific intent to kill is also meritless. A review of the instructions in their entirety reveals the court told the jury "each [defendant] is entitled to have the question of his guilt determined individually and on the basis of the evidence that is admissible against him" and "the defendant is not guilty unless he and the others had an agreement or a common understanding *and shared the intention* to commit these crimes." N.T. Trial, 3/19/96, at 191, 192 (emphasis added). The court stated, "[A defendant] is an accomplice if *with the intent of promotion or facilitating commission of the crime* he solicits, commands, encourages or requests the other person to commit it or aides, agrees to aide, or attempts to aide the other person in planning or committing it." *Id.,* at 184–85 (emphasis added). Thus, the instructions

properly reflected the element of specific intent the Commonwealth had to prove. Remand for further development of this claim is unwarranted. *See McGill*, at 1026.

*Whether appellant's constitutional rights were violated when his penalty phase proceedings were conducted jointly with those of his co-defendant.*

■ Appellant claims his confrontation rights were violated by conducting his penalty phase jointly with co-defendant Lopez; he further claims the joint penalty phase precluded his receiving an individualized sentence. Appellant first argues the joint penalty phase exacerbated the error arising from the improper admission of Lopez's redacted statements during the guilt phase. He further argues that hearing Lopez's penalty phase evidence put the jury at risk of comparing appellant with Lopez, rather than affording appellant individualized consideration.

■ There is no requirement that co-defendants receive separate penalty hearings once both are found guilty; however, each defendant must receive individualized sentencing. *See Lockett v. Ohio*, 438 U.S. 586, 602, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (concept of individualized sentencing in criminal cases has long been accepted). Absent any showing the defendant was prejudiced by the trial court's refusal to sever the proceedings,[14] we will find no abuse of discretion by the trial court. *See Lopez*, at 501.

As discussed *supra*, appellant's confrontation rights were not violated by the admission of Lopez's redacted statements during the guilt phase; thus, the admission of such statements did not affect appellant's confrontation rights at the penalty phase. Additionally, Lopez testified and was cross-examined at the penalty phase. With respect to the argument that Lopez's penalty phase evidence made appellant "look bad" in comparison,[15] we note Lopez received the same sentence of

14. Trial counsel filed a motion to sever, which the trial court denied. N.T. PCRA Hearing, 5/31/00, at 682.

15. Lopez presented more mitigating evidence than appellant did. Appellant also points to the fact Lopez "cooperated" with the police by

death as appellant; thus, appellant hardly looked worse to the jury than Lopez. Furthermore, the record belies appellant's claim he did not receive an individualized sentence: the trial court instructed the jury each defendant was to be sentenced individually and each sentence was to be determined separately, N.T. Trial, 3/20/96, at 21, 141; the trial court repeated the instructions on aggravating and mitigating circumstances for each defendant, *id.,* at 141–44; and the jury was given a separate individualized verdict sheet for each defendant. *Id.,* at 145–47. As the jury is presumed to have followed the trial court's instructions, *see Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663, 672 (1992), there is no need to remand for development of this meritless claim. *See McGill,* at 1026.

*Whether the Commonwealth was improperly permitted to introduce irrelevant and inflammatory testimony that appellant allegedly used an alias.*

▋ Appellant claims during the penalty phase, the Commonwealth improperly introduced evidence of his use of an alias. While testifying about appellant's history of prior violent crimes in Puerto Rico, a Puerto Rican police officer mentioned appellant initially gave him an incorrect name during the investigation for those crimes. *See* N.T. Trial, 3/20/96, at 49–54. Following counsel's objection, the trial court gave a cautionary instruction, informing the jury: "The alias that was used in this particular situation really isn't important and critical. The issue is whether or not [appellant] engaged in a crime of violence in Puerto Rico, that the investigator is talking about." *Id.,* at 54. Appellant contends this instruction was inadequate because it did not tell the jury it could not use the alias against him in deciding his sentence; thus, the testimony injected non-statutory aggravating evidence into the sentencing proceeding.

There is nothing in the record that supports appellant's contention the jury somehow used this fact as an additional aggravating factor; the verdict sheet shows the statutory

giving them his statements; however, Lopez's giving several inconsistent statements, which were later determined to be fabricated, cannot be characterized as cooperation.

factors that were found, and the jury is presumed to have followed the trial court's instruction to not focus on appellant's use of an alias, *Baker*, at 672, but rather on the statutory aggravating factor of his prior crimes of violence. As the PCRA court noted, "the use of a false name pales in comparison to the other facts that were submitted to the jury concerning [appellant] and his prior criminal history." PCRA Court Opinion, 9/15/00, at 11. Appellant was not prejudiced by this testimony, so remand for further development of this claim is unnecessary. *See McGill,* at 1026.

*Whether the Commonwealth was improperly permitted to introduce facts and sentences of appellant's prior convictions during the penalty phase of his trial.*

■ Appellant claims the Commonwealth was improperly permitted to introduce the underlying facts and sentences he received for his prior convictions of voluntary manslaughter, robbery, conspiracy, attempted murder, and car-jacking in Puerto Rico; this evidence was introduced through the testimony of two Puerto Rican police officers to establish the (d)(9) aggravator (defendant has significant history of felony convictions involving use or threat of violence to person) and the (d)(12) aggravator (defendant convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503, or substantially similar crime in any other jurisdiction, either before or at time of offense in issue). Appellant argues *Commonwealth v. Rompilla,* 539 Pa. 499, 653 A.2d 626 (1995), held the details of a prior conviction may be introduced only if such evidence is necessary to prove the convictions involved "the use or threat of violence to the person." Appellant's Brief, at 72 (citing *Rompilla,* at 633). Therefore, he claims, because his prior felonies were offenses which, by definition, involved the use or threat of violence, the Commonwealth should have been precluded from introducing the underlying details of the offenses.

This Court recently addressed this issue in *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790 (2007). In rejecting the appellant's contention that details of prior convictions may not be introduced at the penalty phase, we relied on *Commonwealth v. Marshall,* 537 Pa. 336, 643 A.2d 1070 (1994):

"[a] capital sentencing hearing is not a sanitized proceeding limited only to evidence of aggravating circumstances. *Rather, it must, by necessity, inform the jury of the history and natural development of the events and offenses with which the appellant is charged, as well as those which he has been convicted,* so that the jury may truly understand the nature of the offenses and Appellant's character. *The jury simply cannot perform its function in ignorance of the facts of the crime for which Appellant is being sentenced, or the crimes for which he has previously been convicted, to the extent that those crimes may properly support the existence of aggravating circumstances provided in Section 9711(d).*"

*Rios,* at 814–15 (quoting *Marshall,* at 1074) (emphasis in original). Furthermore, we stated, "Any reliance on *Rompilla* . . . is misplaced as in that case we specifically held that the introduction of the details regarding the appellant's prior conviction for rape were properly admitted in support of § 9711(d)(9)." *Id.,* at 815 n. 9.

Thus, we perceive no error in the admission of the underlying facts of appellant's prior violent felonies; remand for further development of this issue is unwarranted. *See McGill,* at 1026.

*Whether appellant's right to a fair capital trial and sentencing was violated by the prosecutor's improper injection of irrelevant and inflammatory past "bad acts" evidence.*

 Appellant claims improperly introduced guilt phase evidence of his prior bad acts was incorporated by reference into the penalty phase without a limiting instruction, and the jury considered it as evidence of his criminal propensity when sentencing him. The testimony of which appellant complains was given by Moreno, who stated he, appellant, Lopez, and Barbosa were in Allentown because they "were looking for some drug dealers to rob. We didn't find any." N.T. Trial Vol. III, 3/12/96, at 24. Counsel's objection to this statement was overruled.

As the trial court noted, this was not a reference to criminal activity; the "act" Moreno referred to never happened. *See id.*, at 25. Furthermore, to the extent the statement suggested appellant committed a "bad act," evidence of other crimes is admissible for legitimate evidentiary purposes, such as to show motive or intent, or where the act was part of a chain of events forming the history of the case and was part of its natural development. *See Commonwealth v. Seiders*, 531 Pa. 592, 614 A.2d 689, 691 (1992); *see also* Pa.R.E. 404(b)(2), (3). Moreno's testimony provided the motive for the crime, was probative of intent, and gave the background of the planning of the murder. *See* N.T.Trial Vol. III, 3/12/96, at 26 ("[T]hey said that if there was no drug dealers, to rob the landlord."). Appellant's claim is meritless; remand for further development of it is unnecessary. *See McGill*, at 1026.

*Whether the Commonwealth improperly introduced unreliable and speculative evidence that the victim experienced "terror."*

■ Appellant claims the Commonwealth's forensic expert, Dr. Isadore Mihalakis, improperly testified the victim experienced terror. This testimony was in response to the prosecutor's query about what occurs during ligature strangulation, the manner in which the victim died:

What is required is that the ligature be tightened, the blood supply compromised or closed off, the windpipe narrowed, the air supply and oxygenation of the blood being reduced, the brain being deprived of oxygen. There is a period of struggle until the person passes out. The period of struggle is, depending on whether and how quickly the ligature is tightened, it may be quick, as low as 10, 15 seconds, or it may last seconds or minutes depending on how, during this period of time, the person is conscious, alive, appreciates what is happening. *It's a very terrifying period* and then the person passes out and then we have those windows that I spoke of before.

N.T. Trial Vol. III, 3/12/96, at 181 (emphasis added). Appellant argues this was an impermissible reference to the victim's state of mind, and the incorporation of the guilt phase evi-

dence into the penalty phase tainted his sentencing as well as his trial.

The identical issue was raised in co-defendant Lopez's PCRA appeal, in which we stated:

"Expert testimony is permitted as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman." *Commonwealth v. Auker*, [545 Pa. 521] 681 A.2d 1305, 1317 (Pa.1996). The average layperson is generally unacquainted with the physical processes accompanying ligature strangulation; therefore, this was a proper subject for Dr. Mihalakis to explain. While perhaps the comment about a "terrifying period" may not have been necessary, it did little more than articulate the obvious; any conscious person is going to be terrified as they are strangled to death. Viewed in the context of the entire trial, there was nothing prejudicial about Dr. Mihalakis' statement. Even the challenged remark was given in a general, non-specific manner; the doctor was not speculating about the experience of *this* victim.

*Commonwealth v. Lopez*, 578 Pa. 545, 854 A.2d 465, 470 (2004). For the same reasons, appellant's claim fails, and further remand is unnecessary.[16] *See McGill*, at 1026.

*Whether trial counsel was ineffective for failing to investigate, develop, and present substantial mitigating evidence.*

 Appellant claims trial counsel was ineffective for failing to investigate, develop, and present substantial mitigating evidence during the penalty phase, and appellate counsel was ineffective for failing to pursue this claim. Appellant argues trial counsel should have interviewed family members so that evidence of appellant's abusive and traumatic childhood, history of head injuries and strange behavior, auditory and visual

---

16. Furthermore, counsel's very valid defense strategy was to minimize appellant's involvement in the crime, *see* N.T. PCRA Hearing, 5/31/00, at 670; as we noted in *Lopez*, "contesting the brutality of the killing would not have furthered this defense, and quarreling over this comment would only highlight it in the jurors' minds, to [appellant's] detriment." *Lopez*, 854 A.2d at 470.

hallucinations, and family history of mental illness could have been presented in support of the (e)(8) "catch-all" mitigator.[17] He further claims trial counsel should have asked him about his history of drug and alcohol abuse, as such evidence would also have supported the (e)(8) mitigator. Finally, appellant claims trial counsel should have secured an expert mental health evaluation of him and presented such evidence in support of the (e)(8) mitigator.

During the opening, closing, and cross-examination of Commonwealth witnesses in the penalty phase, trial counsel attempted to minimize appellant's role in the murder, as well as his role in prior crimes in Puerto Rico. *See* N.T. Trial, 3/20/96, at 29–30, 45, 59, 118, 120, 126. Appellant was the only witness counsel called; counsel elicited testimony that appellant was raised by his grandmother because his parents had problems, only completed ninth grade, worked in a gas station and obtained a mechanic's certificate, had been married and had two young children in Puerto Rico for whom he provided, and that his role in the crime was minimal. *Id.,* at 77–87. In closing, counsel asked the jury to show mercy, emphasizing appellant had a family. *Id.,* at 122, 124, 126. The trial court instructed the jury on two mitigating circumstances: the (e)(7) "minor participant" mitigator and the (e)(8) "catch-all" mitigator. *Id.,* at 144. The jury found neither circumstance.

At the PCRA hearing, appellant presented the testimony of two experts and five family members who he asserted should have been called at the penalty phase, as well as that of trial and appellate counsel. Dr. Latterner, a neuropsychologist who examined appellant, testified appellant had an IQ in the low borderline range of cognition and had the cognitive capacity of a 12 or 13–year–old. N.T. PCRA Hearing, 5/25/00, at 36, 48. She further testified appellant had organic brain syndrome, memory impairment, and lack of impulse control. *Id.,* at 21, 27, 38. She cited his prior history of head injuries, drug abuse, and hallucinations, *id.,* at 61–62, opining that at the

17. "Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8).

time of the offense, appellant was suffering from an extreme emotional or mental disturbance and was unable to conform his actions to the law. *Id.*, at 42–43, 47, 64–65, 113. Although noting appellant denied having any problems and that his prior pre-sentence report from Puerto Rico revealed no psychiatric history, *id.*, at 69–70, 74, Dr. Latterner concluded psychiatric testing should have been pursued prior to appellant's trial. *Id.*, at 62.

Dr. Bernstein, a forensic neuropsychiatrist who examined appellant, testified he diagnosed appellant with organic cognitive disorder resulting from trauma, toxin exposure, and drug exposure. *Id.*, at 138–40. He testified appellant had a personality disorder, impaired impulse control, and suffered from an extreme emotional or mental disturbance which impaired his capacity and rendered him unable to appreciate the criminality of his conduct or conform to the law's requirements. *Id.*, at 142, 183, 148, 151, 174–75. He acknowledged appellant's prison, school, and medical records revealed no testing regarding brain damage or indicia of organic brain injury, N.T. PCRA Hearing, 5/30/00, at 541; N.T. PCRA Hearing, 5/31/00, at 594; however, he opined appellant's minimization of any current mental health problems indicated appellant *did* have problems, and a layperson would "begin to pick up that [appellant] might not be hitting on all eight cylinders[,]" but probably would not know "why there was a problem." N.T. PCRA Hearing, 5/30/00, at 543. He concluded, given appellant's history, which was "replete with red flags of his neurological and other deficits[,]" trial counsel should have commissioned a neuropsychiatric examination. *Id.*, at 503; *see* N.T. PCRA Hearing, 5/25/00, at 187.

Appellant's mother, sister, brother, cousin, ex-wife, and girlfriend testified about appellant's upbringing and young adult life. Appellant was a sickly infant, N.T. PCRA Hearing, 5/30/00, at 370, 411–12, born into an abusive marriage, *id.*, at 366–69, 414–15, and his father abused him emotionally and physically, *id.*, at 372–73, 377–78, 432–34, even hitting him on the head. *Id.*, at 413. Appellant was left to be raised by his paternal grandmother at the age of two, with virtually no

contact with his parents until he was 11. *Id.*, at 373, 380, 416, 425. Appellant's sister testified he was picked on in school, *id.*, at 384, and appellant's cousin testified appellant was injured as a child when he was hit in the head with a bat during a ball game. *Id.*, at 480. Appellant's brother and sister testified appellant rode a motorcycle in his youth, fell off frequently, and never wore a helmet. *Id.*, at 385–86, 437. Both appellant's mother and girlfriend testified appellant's grandfather had been mentally ill. *Id.*, at 416, 453.

Appellant's brother, sister, and cousin testified there were changes in appellant's behavior when he began using cocaine as a young adult; he became agitated, nervous, and paranoid. *Id.*, at 386–88, 438–39, 483–84. Appellant's cousin and girlfriend testified appellant never wore a mask when working with chemical fumes in his job as a mechanic during his teenage years, *id.*, at 482, 455, and appellant's ex-wife said he was exposed to fumes and chemicals at his job, N.T. PCRA Hearing, 5/26/00, at 292–93, and he would often suffer from dizziness and headaches. *Id.*, at 290. He once suffered a temporary bout of blindness following a dizzy spell. *Id.*, at 294–95.

Appellant's ex-wife testified appellant had auditory hallucinations, *id.*, at 290, and he once hallucinated seeing the devil and was so traumatized he soiled himself. *Id.*, at 291. Appellant's girlfriend also testified concerning appellant's auditory hallucinations, N.T. PCRA Hearing, 5/30/00, at 454, 457, and said he was often agitated by nightmares. *Id.*, at 455. She also confirmed his drug use. *Id.*, at 456.

Appellant's mother, brother, and cousin testified trial counsel never contacted them, but that they would have been willing to testify on appellant's behalf had they been asked. *Id.*, at 420–21, 439, 485. Appellant's sister testified that although trial counsel interviewed her, he did not ask her about appellant's background; however, she would have testified concerning these facts had she been asked. *Id.*, at 389–90. Appellant's ex-wife testified she would have been willing to testify for appellant at trial, but trial counsel never asked her. N.T. PCRA Hearing, 5/26/00, at 293.

Trial counsel testified that although he had 17 years' experience, which included criminal cases, this had been his first capital case. N.T. PCRA Hearing, 5/31/00, at 610–11, 660. He met with appellant about 15 or 20 times, having lengthy discussions with him. *Id.*, at 639. Counsel acknowledged he did not contact appellant's mother, brother, and cousin, *id.*, at 623, and did not question appellant's sister and ex-wife about appellant's childhood, head injuries, drug abuse, and performance in school. *Id.*, at 624–27, 632. He acknowledged these were not omissions born of strategy. Counsel testified that although the information provided by appellant's family in their affidavits and at the PCRA hearing was something he would have wanted to know during the penalty phase, *id.*, at 633, he would not have presented the testimony of appellant's girlfriend, who had been involved in appellant's prior crimes in Puerto Rico and would have marred the image of appellant as a stable family-man. *Id.*, at 651, 703. Counsel testified he had no tactical reason for not having appellant psychologically evaluated, *id.*, at 633, and the expert testimony regarding appellant's organic brain damage would have been relevant at the penalty phase. *Id.*, at 634.

Other portions of counsel's testimony, however, revealed he was not remiss in his inquiries regarding mitigation evidence, based on the information appellant supplied him and his interactions with appellant. Counsel said appellant gave him very little information about his family, *id.*, at 647–48; he had the impression appellant was estranged from his family, most of whom were in Puerto Rico, and did not seem to want to involve them. *Id.*, at 620–23. When counsel asked appellant if there was anyone in Puerto Rico who could help with his case, appellant said no, *id.*, at 648, 703; it was counsel's impression appellant did not want his family contacted, although he never explicitly forbade counsel from doing so. *Id.*, at 704–05. Counsel further testified because appellant had been raised by his grandmother and his immediate family had not been significantly involved in his upbringing, he thought they would have little relevant information to offer concerning appellant's childhood. *Id.*, at 690. Counsel also asked appel-

lant about his schooling and was aware appellant dropped out of school to work as a mechanic. *Id.,* at 649.

Regarding appellant's drug use, counsel testified he would have offered this as mitigation evidence had he known about it, *id.,* at 652; however, counsel stated he asked appellant if he was on drugs during the planning and commission of the offense, and appellant responded he was not. *Id.,* at 627–28, 652, 698–99. When counsel asked if appellant had used drugs on other occasions, such as during his travels in New Jersey and Florida where he committed other crimes with his co-defendants, appellant said he had not. *Id.,* at 628, 652–54, 698–99. Thus, counsel concluded appellant did not have a drug problem. *Id.,* at 628, 699.

Regarding appellant's mental health, counsel asked appellant whether he had any medical problems or anything that would be helpful in his defense; appellant said he had "nothing like that." *Id.,* at 620. Counsel asked appellant if he ever had emotional or psychiatric difficulties, and appellant responded he had not. *Id.,* at 654. Appellant said nothing about his auditory or visual hallucinations, *id.,* at 655, and there was nothing from his demeanor which would have led counsel to believe he had any type of mental disorder. *Id.,* at 658, 660–61, 691–92. Counsel stated appellant was "very pleasant" and "even tempered," *id.,* and although appellant seemed depressed because of his situation, "he never, ever, never exhibited . . . any unusual behaviors. . . ." *Id.,* at 659. Counsel noted he had previous clients who he had immediately sought to have evaluated based upon their conduct, but appellant did not display such signs of mental illness, and counsel never doubted appellant's ability to participate in his defense. *Id.,* at 660. Thus, counsel did not seek a psychiatric evaluation for appellant.

Appellant relies on *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), in arguing counsel was required to investigate reasonably mitigating evidence of childhood abuse, family dysfunction and neglect, and mental health deficits. Appellant argues even if he told counsel he had nothing to offer in the way of mitigating evidence, counsel

still had an independent duty to investigate his background in preparation for the penalty phase. *See* Appellant's Brief, at 35. Recently, in *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775 (2006), and *Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268 (2006), this Court cited *Williams* and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), "for the proposition that capital counsel have an obligation to pursue all reasonably available avenues of developing mitigation evidence." *Gorby,* at 790; *see also Jones,* at 293.

 At the time of appellant's 1996 trial, however, these cases had not been decided, and the degree of investigation required for capital counsel to not be deemed ineffective had not evolved to the extent currently required. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective *at the time.*" *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 51 (2002) (quoting *Strickland,* at 689, 104 S.Ct. 2052) (emphasis added).

Prior to *Williams* and its progeny, case law regarding what is required of counsel during the penalty phase was not as exacting as today. *See, e.g., Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 448 (1999) (counsel not ineffective for failing to present mental health mitigating evidence where counsel had no reason to know appellant might have mental problem); *Commonwealth v. Holland,* 556 Pa. 175, 727 A.2d 563, 566 (1999) (counsel not ineffective for failing to call mental health expert at penalty phase, where forensic psychiatrist's reports and previous pre-sentence reports indicated appellant did not suffer from major mental illness); *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, 238 (1998) (counsel not ineffective where no evidence counsel had notice appellant had any mental illness); *Commonwealth v. Uderra,* 550 Pa. 389, 706 A.2d 334, 340 (1998) (counsel not ineffective for failing to investigate appellant's history of psychological problems where appellant never revealed such information to counsel). Thus, the reasonableness of counsel's actions cannot be as-

sessed under requirements enunciated subsequent to the time of such actions.

Trial counsel, during his numerous interactions with appellant, never detected any signs of mental illness, and appellant never gave counsel any useful information about his childhood or family when asked. *See Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 266 (2006) (in evaluating reasonableness of counsel's investigation, court must remember counsel's decisions may depend heavily on information his client provides to him). Appellant's prison records revealed no psychiatric problems other than situational depression; various reports indicated appellant denied ever having hallucinations, drug abuse problems, or head injuries. Although one of the reports recommended appellant receive substance abuse counseling because he was in denial about his past drug use, *see* Psychiatric Evaluation 6/21/96, R.R. Ex. 39, at 76, appellant denied having been on drugs when counsel questioned him about drug use at the time of the offense, and appellant offered nothing further regarding his past cocaine use. Overall, appellant's records showed no prior psychiatric history; one of the psychiatric reports indicated although appellant was immature, impulsive, and oppositionally defiant, he was not mentally ill. *See* Undated Report, R.R. Ex. 39, at 74–75. Appellant's school records revealed nothing other than his being a poor student. *See* R.R. Ex. 35. Under these circumstances, counsel cannot be deemed ineffective for failing to pursue a psychiatric evaluation or to investigate evidence of appellant's childhood, alleged head injuries, and substance abuse.[18]

18. Recently, the United States Supreme Court upheld a district court's "finding that the poor quality of [the defendant's] alleged mitigating evidence prevented him from making 'a colorable claim' of prejudice." *Schriro v. Landrigan*, —— U.S. ——, ——, 127 S.Ct. 1933, 1943, 167 L.Ed.2d 836 (2007). In *Landrigan*, the defendant had instructed counsel not to present any evidence at the penalty phase, but later claimed counsel was ineffective for failing to explore additional mitigating evidence. *Id.*, at 1938. The defendant alleged he was exposed to drugs and alcohol *in utero*, abandoned by his birth mother, subjected to his adoptive mother's substance abuse, and began his own substance abuse at an early age; based on his biological family's history of violence, he claimed he may also have been genetically predisposed to violence. *Id.*,

Counsel testified his trial strategy was to show appellant was not a participant in the crime, or that if he did participate, his role was minimal and peripheral. N.T. PCRA Hearing, 5/31/00, at 636–37. Counsel attempted to do this at the penalty phase; the fact that in hindsight, another strategy may have been more effective does not render him ineffective.[19] Accordingly, appellant's underlying claim of trial counsel's ineffectiveness is meritless, and there is no need to remand for still more development of this claim. *See McGill*, at 1026.

*Whether trial counsel ineffectively failed to investigate, develop, and present the evidence of co-defendant George Lopez's history of involvement in similar crimes.*

Appellant claims trial counsel failed to investigate and present evidence of Lopez's history of similar crimes at the penalty

at 1943. In reversing the Ninth Circuit Court of Appeals' grant of an evidentiary hearing on the defendant's ineffectiveness claim, the Supreme Court noted the defendant's "mitigation evidence was weak, and the postconviction court was well acquainted with [his] exceedingly violent past and had seen first hand his belligerent behavior." *Id.*, at 1944. Quoting the initial Court of Appeals panel, which had affirmed the denial of review, the Supreme Court stated, " 'On this record, assuring the court that genetics made [the defendant] the way he is could not have been very helpful. There was no prejudice.' " *Id.* (quoting *Landrigan v. Stewart*, 272 F.3d 1221, 1229 (9th Cir.2001)).

Here, appellant's ineffectiveness claim was evaluated at a hearing, and the PCRA court concluded he could not establish prejudice; however, as *Landrigan* demonstrates, where the alleged mitigating evidence is so weak that it could not have been helpful, no colorable claim of ineffectiveness is established, and a hearing is not required.

19. *Cf. Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767 (2004) (counsel found ineffective for failing to prepare for penalty phase where he only met with appellant for four hours, introduced no mitigating evidence other than appellant's age and role as minor participant in crime, counsel's presentation at penalty phase included no affirmative evidence at all—only brief argument and stipulation, and Commonwealth only sought one aggravator). In *Malloy*, we concluded, "counsel failed to so much as conduct a cursory review of appellant's background[,]" *id.*, at 788, and "undertook little or no affirmative effort aimed at the penalty phase[,]" *id.*, at 786; here, in contrast, counsel spent much time interviewing appellant, asked him if his family could be of assistance, spoke to appellant's sister, and attempted to present appellant as a family-man whose involvement in the crime had been peripheral. Counsel argued two mitigating circumstances, and the Commonwealth sought four aggravators.

phase; appellant contends this evidence would have demonstrated Lopez bore "the lion's share" of culpability and would have supported the defense theory that appellant was only a minor participant in the crime. Appellant further argues this evidence constituted *Brady*[20] material which the Commonwealth had a duty to provide him.

Contrary to appellant's assertion, Lopez was not previously convicted of robbery or attempted murder; instead, he pled *nolo contendere* to simple assault. *See* PCRA Court Opinion, 9/15/00, at 20; N.T. PCRA Hearing, 5/31/00, at 677–78. Furthermore, trial counsel testified he would not have wanted this evidence before the jury, as "if [he] blackened Lopez's eyes then [he] blacken[ed] [appellant's] eyes," *id.,* at 673, this being a joint trial. Thus, counsel would not have wanted to show Lopez was capable of such crime, because appellant was associated with Lopez. For the same reason, appellant's argument that this evidence constituted *Brady* material fails, as Lopez's prior history would have made appellant look worse rather than exculpating him. Remand for further development of these meritless claims is unwarranted. *See McGill,* at 1026.

*Whether appellant was improperly precluded from presenting and arguing the jury should consider, as mitigation, the lesser sentences imposed on the individuals who planned and carried out the murder of David Bolasky.*

██ Appellant claims he was improperly precluded from arguing at the penalty phase that the jury should consider, as mitigation, the lesser sentences imposed on his co-conspirators. This issue was presented and rejected in Lopez's PCRA appeal; we cited *Commonwealth v. Frey,* 520 Pa. 338, 554 A.2d 27, 33 (1989) and *Commonwealth v. Haag,* 522 Pa. 388, 562 A.2d 289, 299 (1989), which held the fact a co-defendant received a sentence less than death is not a mitigating circumstance for purposes of sentencing another defendant for the same crime. We noted, "There is no mitigating circumstance which provides for the type of comparison appellant suggests;

**20.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

even the 'catch-all' mitigating circumstance would not encompass evidence of co-conspirators' sentences because such evidence has nothing to do with 'the character and record of the defendant' or 'the circumstances of his offense.' " *Lopez*, 854 A.2d at 471 (citing 42 Pa.C.S. § 9711(e)(8)). Furthermore, appellant overlooks the fact that Barbosa pled guilty in exchange for the lesser sentence of life, and Moreno plea bargained for a 20 to 40–year sentence in exchange for his cooperation with law enforcement. *See Romero*, at 1016; N.T. PCRA Hearing, 5/26/00, at 199, 304. Thus, appellant's claim is meritless, and we need not remand for further development of this argument. *See McGill*, at 1026.

*Whether the trial court erred in allowing the jury to consider Jorge Barbosa's inadmissible statement to Captain Bucarey during the penalty phase proceedings.*

Appellant's next claim involves the incorporation of certain evidence from the guilt phase into the penalty phase. Appellant argues the incorporation of Barbosa's prior statement, read at the guilt phase, into the penalty phase prejudiced him because the statement was the only evidence appellant participated in the killing and Bolasky was killed to prevent his testimony. As the jury found the (d)(5) "witness elimination" aggravator, but not the (e)(7) "minor participant" mitigator,[21] appellant claims Barbosa's statement *"single-handedly* established the 'witness elimination' aggravator for the Commonwealth while simultaneously gutting [a]ppellant's 'minor participant' mitigator." Appellant's Brief, at 52 (emphasis in original).

Contrary to appellant's contention, Barbosa's statement was not the only evidence of appellant's direct participation in the robbery and strangling of Bolasky; the testimony of Moreno and Daniel Lopez established appellant was more than a minor participant in the killing. Furthermore, these witnesses' testimony established the victim was killed to prevent his testimony against appellant and the others. Therefore, as

21. "The defendant's participation in the homicidal act was relatively minor." 42 Pa.C.S § 9711(e)(7).

in the guilt phase, the incorporation of Barbosa's erroneously admitted prior statement into the penalty phase was harmless error. *See Romero,* at 1019 (citing *Commonwealth v. Foy,* 531 Pa. 322, 612 A.2d 1349, 1352 (1992) (error is harmless where improperly admitted evidence is merely cumulative of substantially similar, properly admitted evidence)). Appellant's claim is meritless; therefore, remand is unwarranted. *See McGill,* at 1026.

*Whether appellant's death sentence was based on the unconstitutional application of the (d)(5) "witness elimination" aggravating circumstance.*

Appellant claims the jury improperly found the (d)(5) "witness elimination" aggravating circumstance, because there was no evidence Bolasky was killed to prevent his testifying against *appellant;* rather, appellant's co-conspirators testified they killed Bolasky to prevent his identifying Moreno, who he recognized as his tenant. Appellant also claims there was no direct evidence the killing occurred for such purpose, as is required when there is no pending prosecution at the time of the murder. *See Commonwealth v. Strong,* 522 Pa. 445, 563 A.2d 479, 485 (1989).

In *Strong,* this Court reiterated the holding in *Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780 (1988), that the (d)(5) aggravating circumstance may be established by direct evidence the killing resulted from the intention to eliminate a potential witness. *Strong,* at 485 (quoting *Appel,* at 784 n. 2). Previously, the rule was that evidence must be introduced that the killing was to prevent the victim's testimony in a pending grand jury or criminal proceeding. *See Commonwealth v. Caldwell,* 516 Pa. 441, 532 A.2d 813, 817 (1987); *Commonwealth v. Crawley,* 514 Pa. 539, 526 A.2d 334, 344–45 (1987).

The Commonwealth relied on Barbosa's guilt phase testimony to establish the (d)(5) aggravating circumstance; Barbosa testified the initial plan was only to assault Bolasky, but then they decided to kill him to prevent him from identifying his tenant, Moreno, who was Lopez's nephew:

324

A. It was just a matter of assaulting him. But then he came and said no, he had to be killed.

Q. Who said that?

A. Mr. Ivan Lopez.

Q. Did he say why Mr. Bolasky had to be killed?

A. Because if we had left him alive, then [Lopez's] nephew would go to jail for the assault.

N.T. Trial, 3/15/96, at 27.

Barbosa further testified on cross-examination:

A. And [Lopez] told me we have to kill the gentleman because if the gentleman stays alive, then his nephew is gonna go to jail, understand?

*Id.*, at 85.

Although the fact-finder could have inferred appellant and his co-conspirators killed Bolasky to prevent his identifying all of his assailants because all of the conspirators stood to lose if Bolasky remained alive to implicate them, there was no direct evidence that Bolasky was killed to prevent his testimony against appellant; Barbosa's testimony established Lopez's concern that the victim would identify Moreno. *Id.* However, even if the (d)(5) aggravator was not established, the jury found other aggravating circumstances and no mitigating circumstances; the penalty would still have been death. See 42 Pa.C.S. § 9711(c)(1)(iv); *Commonwealth v. Christy,* 511 Pa. 490, 515 A.2d 832, 842 (1986) (since jury found one aggravating circumstance and no mitigating circumstances, death sentence upheld even though another aggravating circumstance is held invalid) (citing *Commonwealth v. Beasley,* 504 Pa. 485, 475 A.2d 730, 738 (1984)). Thus, even without the (d)(5) aggravator, the result of the penalty phase would not have differed, so we need not remand for further development of appellant's claim. *See McGill,* at 1026.

*Whether the jury improperly found the existence of the (d)(6) aggravator.*

Appellant claims the trial court improperly instructed the jury regarding the (d)(6) aggravating circumstance (defendant

committed killing during perpetration of felony), because he was merely an accomplice to the murder and did not actually strangle Bolasky; thus, the jury improperly found this aggravator. Appellant contends the trial court should have instructed the jury, pursuant to *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657 (1998) (plurality), the (d)(6) aggravator is inapplicable to one who is found guilty of first degree murder as an accomplice, but not as the actual killer.

*Lassiter* held "[§ ] 9711(d)(6) may not be applied to an accomplice who does not 'commit' the killing in the sense of bringing it to completion or finishing it." *Id.*, at 662. Even if the jury found appellant guilty as an accomplice to first degree murder, thereby rendering the (d)(6) aggravator inapplicable, at least two other aggravating circumstances, § 9711(d)(9) and (12), existed, and no mitigating circumstances were found; the penalty would still have been death. *See* 42 Pa.C.S. § 9711(c)(1)(iv); *Christy, supra.*[22] Thus, appellant is unable to establish the result of the penalty phase would have differed had a *Lassiter* instruction been given, and further remand for development of his ineffectiveness claim in this regard is unnecessary. *See McGill*, at 1026.

*Whether the jury improperly found the (d)(12) aggravator.*

Appellant claims the jury improperly found the (d)(12) aggravating circumstance (defendant convicted of voluntary manslaughter as defined in 18 Pa.C.S. § 2503, or substantially similar crime in any other jurisdiction, either before or at time of instant offense). The Commonwealth relied on appellant's prior conviction for manslaughter in Puerto Rico under 33 L.P.R.A. § 4004:

**22.** *See also Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 512 n. 8 (2004) (no relief on *Lassiter* claim where *Lassiter* was decided after appellant's judgment of sentence became final, and at least one other aggravating circumstance and no mitigating circumstances were found). *Cf. Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 612 (2007) (trial court's failure to give *Lassiter* instruction erroneous where verdict sheet did not indicate whether finding of guilt was based on principal or accomplice liability, and (d)(6) was only aggravating circumstance presented and proved; however, error harmless in light of trial court's specific instruction that (d)(6) applied only if "the defendant committed a killing" during perpetration of felony).

Any person who kills another as a result of a sudden quarrel or fit of anger shall be punished by imprisonment for a fixed term of ten years. Should there be aggravating circumstances, the fixed term established may be increased to a maximum of fifteen years; if there should be extenuating circumstances, it may be reduced to a minimum of six years.

*Id.*

Section 2503 of the Crimes Code defines voluntary manslaughter as follows:

(a) General Rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S. § 2503(a).

Appellant argues intent to kill is an element of Pennsylvania's crime of voluntary manslaughter, but is not an element under Puerto Rico's crime of manslaughter; therefore, the two crimes are not substantially similar as § 9711(d)(12) requires. Contrary to appellant's claim, however, intent to kill is an element of manslaughter under 33 L.P.R.A. § 4004; it is premeditation that is not a required element. *See Pueblo v. Moreno Morales,* 132 D.P.R. 261 (1992). Puerto Rico's crime of voluntary manslaughter, 33 L.P.R.A. § 4005,[23] only requires negligence, which is not the same element of intent as required by Pennsylvania's § 2503. *See Pueblo v. Rivera,* 123 D.P.R. 739 (1989). However, appellant was convicted under § 4004 (manslaughter), not § 4005 (voluntary manslaughter); therefore, the intent element is not negligence, and is substantially similar to § 2503. As appellant's claim is meritless, further remand is unnecessary. *See McGill,* at 1026.

**23.** Section 4005 provides: "Any person who acting with negligence or who, in the commission of an unlawful act not amounting to a felony, causes the death of another, shall be punished by imprisonment for a fixed term of one year and eight months." 33 L.P.R.A. § 4005.

*Whether appellant is entitled to relief from his death sentence because of the prosecutor's improper closing argument.*

 Appellant claims the prosecutor made several improper arguments during his penalty phase closing, that trial counsel was ineffective for failing to object, and appellate counsel was ineffective for failing to raise the issue on direct appeal. Our standard of review is well settled:

"Challenged prosecutorial comments must be considered in the context in which they were made." *[Commonwealth v.] King,* [554 Pa. 331] 721 A.2d [763,] 783 [ (Pa.1998) ]. In reviewing the statements made by the prosecutor, we have noted that:

[A] prosecutor must be free to present his or her arguments with logical force and vigor. Reversible error only exists if the prosecutor has deliberately attempted to destroy the objectivity of the fact finder such that the unavoidable effect of the inappropriate comments would be to create such bias and hostility toward the defendant that the jury could not render a true verdict.

*[Commonwealth v.] Miles,* [545 Pa. 500] 681 A.2d [1295,] 1300 [ (Pa.1996) (citations omitted) ]; *also see [Commonwealth v.] Paddy,* [569 Pa. 47] 800 A.2d [294,] 316 [ (Pa. 2002) ]. "Furthermore, during the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is permitted even greater latitude in presenting argument." *King,* 721 A.2d at 783.

Moreover, even if the alleged statements by the prosecutor may have been improper, we have held that "not every intemperate or uncalled for remark by a prosecutor requires a new trial." *Miles,* 681 A.2d at 1302. Indeed, "where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict, then the error is harmless beyond a reasonable doubt." *Id.* (citing *Commonwealth v. Story,* [476 Pa. 391] 383 A.2d 155, 166 (Pa.1978)).

*Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 517 (2004).

Appellant claims the prosecutor diminished the jury's sense of responsibility for imposing the death penalty by stating, "[T]his decision is not something that you are doing. This decision is not something that you are making. This decision was made on January 3, 1995, by George Ivan Lopez and Edwin Rios R[o]mero." N.T. Trial, 3/20/96, at 107. However, appellant isolates a portion of the prosecutor's entire statement and takes it out of context; the prosecutor continued, "The law is written in stone. What they have done, is done. Your job is to apply those two things and render a correct verdict." *Id.* Thus, the prosecutor was not suggesting the jury abdicate its responsibility for determining whether the death penalty was warranted, but rather was arguing appellant and his co-defendant were responsible for the victim's death and must face the consequences. Appellant's claim is meritless.

Appellant argues the prosecutor improperly argued the circumstances of the offense alone required imposition of a death sentence when he stated appellant's actions "sealed this verdict" and such actions "require[d] a [death] verdict." *Id.,* at 108. However, appellant again isolates only a portion of the prosecutor's entire statement. The prosecutor argued the (d)(6) aggravator (killing committed during perpetration of felony) alone was sufficient to warrant a death sentence; in so doing, he stated appellant's killing the victim during the robbery was an aggravating circumstance which would permit the jury to impose the death penalty. As this was permissible argument, *see* 42 Pa.C.S. § 9711(c)(1)(iv) (verdict must be sentence of death if jury finds at least one aggravating circumstance and no mitigating circumstances or one or more aggravating circumstances which outweigh any mitigating circumstances), appellant's claim fails.

Appellant argues the prosecutor improperly vouched for the credibility of the police witnesses and conveyed the impression there was evidence not presented to the jury which supported the charges against appellant. Appellant does not quote any

specific portion of the prosecutor's statement; however, the transcript page he references merely contains a summary of the investigative actions of police Detectives Hanna and O'Donnell, who both testified at trial. *See* N.T. Trial, 3/20/96, at 110. Read in context, this was not a reference to evidence outside the record, nor was it vouching for the officers' credibility; it was simply a narrative of the events that produced Moreno's confession. This claim is meritless.

Appellant argues the prosecutor improperly argued appellant posed a danger if sentenced to life imprisonment:

> Edwin Rios R[o]mero has also compiled a significant history of prior felony convictions which involved violence or the threat of violence.... Why is that an aggravating circumstance? Because it shows that *Edwin Rios R[o]mero has been persistent in his refusal to curb his violent behavior. Again and again and again, Mr. R[o]mero has been convicted of felonies that involve violence or the threat of violence. There is a pattern here, ladies and gentlemen, and that in itself, all by itself, is an aggravating circumstance.* And once again, all by itself, that aggravating circumstance is sufficient to warrant you returning a penalty of death in this case.

*Id.,* at 112 (emphasis added).

Again, appellant isolates a portion of the prosecutor's statement and takes it out of context, focusing only on the underlined portion of the above quotation. Read in its entirety, the statement clearly is an argument for the (d)(9) "significant history of violent felonies" aggravator, explaining why this is an aggravating circumstance and arguing its relevance in appellant's case; it is not an argument of future dangerousness.

Appellant argues the prosecutor improperly introduced victim impact evidence when he referenced the victim's experience in the last seconds of his life; he further contends the prosecutor improperly urged the jury to exercise vengeance, showing appellant the same mercy he showed the victim. The prosecutor stated:

I want you to think back to the last thing that David Bolasky saw as he knew he was dying. Do you know what the last thing David Bolasky saw, two of the last things that he saw? They're sitting right in front of you.... Think about that when they ask you for mercy.

*Id.,* at 115.

This Court has specifically determined it is permissible during the penalty phase for a prosecutor to ask the jury to show the defendant the same mercy he showed the victim. *Commonwealth v. Basemore,* 525 Pa. 512, 582 A.2d 861, 870 (1990), *cert. denied,* 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992); *see also Commonwealth v. Washington,* 549 Pa. 12, 700 A.2d 400, 415–16 (1997); *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1204 (1996) (citing *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 301 (1983)). This claim is meritless, as are all of appellant's claims of prosecutorial misconduct; accordingly, remand for further development of these claims with respect to appellate counsel's performance is unnecessary. *See McGill,* at 1026.

*Whether appellant's death sentence is cruel and unusual punishment because appellant is mentally retarded.*

 Appellant claims he cannot be subject to the death penalty because he is mentally retarded; he further argues, because of trial counsel's failure to investigate this issue, the jury never heard evidence of his "borderline" retardation, and appellate counsel failed to present this claim on direct appeal.

*Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), held execution of mentally retarded criminals violates the Eighth Amendment. Although *Atkins* was decided after appellant's trial and sentencing, this Court held since *Atkins* announced a new rule of law prohibiting a certain category of punishment for a class of defendants because of their status, it fell under an exception to the general rule of nonretroactivity. *See Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624, 629 n. 5 (2005) (citing *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)).

In *Miller*, the petitioner, having been denied relief after a hearing on his first PCRA petition, filed a second petition, seeking relief under *Atkins*. The PCRA court granted relief without an evidentiary hearing, reasoning the documentary evidence, the penalty phase evidence, and the evidence presented at the petitioner's first PCRA hearing established the petitioner's mental retardation by a preponderance of the evidence. The PCRA court applied the definitions of "mentally retarded" set forth by the American Psychiatric Association (APA) and the American Association of Mental Retardation (AAMR).[24] *Miller*, at 626–27. This Court vacated and remanded for further proceedings, *id.*, at 633; although we agreed with the PCRA court that the petitioner could use either classification of "mentally retarded" to establish his claim, we concluded the testimony presented at the first PCRA hearing occurred in the context of establishing the petitioner suffered from organic brain damage as well as mental retardation. *Id.*, at 632–33.[25] The testimony offered by the petitioner's expert was equivocal on the issue of mental retardation, since he testified the petitioner functioned in the "borderline retarded" or "mentally retarded" range. We noted:

> [T]here is a critical difference between these two classifications, since if a defendant is classified as having borderline intellectual functioning, he would not automatically be considered "mentally retarded" under *Atkins* unless he also showed significant deficits in adaptive behavior.

24. As of January 1, 2007, the AAMR is now known as the American Association on Intellectual and Developmental Disabilities.

25. At the time *Miller* was decided, over three years had passed since *Atkins* announced each state had to set standards and procedures for adjudicating the mental retardation of a defendant in a capital case; however, although bills had been introduced, no legislation had been passed. *See Miller*, at 633 (Eakin, J., concurring); *see also Miller*, at 633 n. 11. To date, legislation concerning this subject has still not been passed, and cases continue to "languish and courts await action which has not been forthcoming." *Miller*, at 633 (Eakin, J., concurring). In this case, regardless of what standard is employed, appellant's claim fails, as he argues he is "borderline mentally retarded," which, as discussed *infra*, is insufficient to warrant relief.

*Id.* Accordingly, we remanded for an evidentiary hearing specifically to address the mental retardation issue.

Here, appellant presented two experts' testimony at his PCRA hearing; they testified on the issues of mental retardation, organic brain damage, mental illness, and capacity to form intent. This testimony fluctuated concerning the degree of appellant's mental impairment. *Cf.* N.T. PCRA Hearing, 5/25/00, at 36 (Dr. Latterner's testimony that he "do[es] not believe [appellant's] mentally retarded"), *id.*, at 44 (Dr. Latterner's testimony that appellant is "functioning in the low borderline range"), *id.*, at 77 (Dr. Latterner's testimony that "Clearly, [appellant's] mentally retarded, and he's [sic] brain damage"), and *id.*, at 94–96 (Dr. Latterner's testimony that, despite two IQ scores in mentally retarded range, appellant is not mentally retarded); *see also id.*, at 140 (Dr. Bernstein's testimony that appellant is "mildly mentally retarded, borderline mentally retarded"); *id.*, at 159 (Dr. Bernstein's testimony that appellant suffers from "Mental Retardation, Mild Severity"); *id.*, at 160 (Dr. Bernstein's testimony that appellant is "borderline mentally retarded"); N.T. PCRA Hearing, 5/30/00, at 517 (Dr. Bernstein's disagreement with Dr. Latterner that appellant is not mentally retarded); N.T. PCRA Hearing, 5/31/00, at 576–77 (Dr. Bernstein's testimony that "[s]ometimes you are going to test him, he's going to be mild MR[, s]ometimes you are going to test him, he's going to be borderline"); *id.*, at 585 (Dr. Bernstein's testimony that "depending on which version of the [test] you are giving, . . . on a good day, he's going to be borderline, and on a bad day, he's going to be mildly mentally retarded"). The Commonwealth's expert, Dr. Cooke, testified appellant was "in the borderline range, not in the retarded range," N.T. PCRA Hearing, 6/2/00, at 1088, and there was "nothing in the records to indicate that he would fall into the impaired range in terms of activities, of daily living, either, so it's my opinion that he is of borderline intelligence, but he is not mentally retarded." *Id.*, at 1088–89.

The PCRA court credited the testimony that appellant was not mentally retarded, noting:

Although the legal, moral, and philosophical arguments concerning this issue are interesting and thought-provoking,

these issues are irrelevant to this case since the Defendant does not fall into either category [of mentally retarded or mentally ill].

PCRA Court Opinion, 9/15/00, at 10.

Significantly, appellant does not argue he is mentally retarded; rather, he labels himself "borderline mentally retarded." *See* Appellant's Brief, at 38 ("Mr. Romero is borderline mentally retarded"); *id.*, at 39–40 ("the jury never heard anything about [a]ppellant's borderline mental retardation."). Under *Miller*, being "borderline mentally retarded" does not automatically place a person in the "mentally retarded" category; there also have to be "significant deficits in adaptive behavior." *Miller*, at 630 n. 8, 633.[26]

The PCRA hearing testimony revealed appellant had an ex-wife in Puerto Rico, with whom he had children and bought a house, he could diagnose and fix mechanical problems with cars, and he was able to travel to New Jersey with his cousin and show him around, helping him find a job. *See* N.T. PCRA Hearing, 5/25/00, at 84–85; N.T. PCRA Hearing, 5/31/00, at 569, 571. The Commonwealth's expert, Dr. Cooke, noted:

> The other part of defining retardation is whether or not an individual is impaired in activities of daily living. Can they hold a job? Can they make purchases? Can they travel independently? Things of that nature. Can they communicate effectively? And I see nothing in the records to indicate that he would fall into the impaired range in terms of activities, of daily living, either, so it's my opinion that he is of borderline intelligence, but he is not mentally retarded.

N.T. PCRA Hearing, 6/2/00, at 1088–89.

Thus, unlike *Miller*, there was a hearing at which testimony was heard on the issue of mental retardation, and the experts

**26.** The AAMR lists adaptive skills as language and money concepts, responsibility and ability to follow rules, meal preparation, and money management; the APA's DSM–IV Manual requires significant limitation in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.*, at 630 n. 8.

did not rely on IQ test results alone. The PCRA court's conclusion that appellant is not mentally retarded is supported by the record. As appellant's underlying claim fails, remand is unnecessary to develop the claim of appellate counsel's ineffectiveness. *See McGill,* at 1026.

*Whether appellant is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described herein.*

Finally, appellant claims the cumulative effect of all the alleged errors entitles him to relief. However, this Court has repeatedly stated, "no number of *failed* claims may collectively attain merit if they could not do so individually." *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992) (emphasis in original).

Having found appellant is not entitled to relief, we affirm the order of the PCRA court and direct the Prothonotary of this Court to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

Order affirmed.

Justice CASTILLE and FITZGERALD join the opinion.

Chief Justice CAPPY files a concurring opinion in which Justice BAER joins.

Justice SAYLOR files a concurring and dissenting opinion in which Justice BALDWIN joins.

Chief Justice CAPPY, concurring.

I join the majority opinion with the exception of the legal point raised by Justice Saylor's concurring and dissenting opinion. Specifically, I agree with Justice Saylor that Appellant may rely on *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in support of his claim that counsel was ineffective for failing to adequately investigate mitigating evidence as this court has clearly allowed such reliance in the past. *See* Concurring and Dissenting Opinion at 5–7 (pointing out that this court has previously

rejected the majority's perspective regarding *Williams* and *Wiggins* in *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761 (2004)). Nevertheless, in this case, I join the result of the majority opinion on this issue because I agree that the quality of evidence that Appellant proffered in support of his claim of counsel's ineffectiveness for failing to adequately investigate and present mitigating evidence was too weak to justify a new penalty phase hearing.

Justice BAER joins this concurring opinion.

Justice SAYLOR, concurring and dissenting.

I concur in the result as to Appellant's guilt-phase claims and respectfully dissent as to penalty.

My principal difference on the penalty claims relates to Appellant's claim of ineffective assistance of counsel concerning counsel's investigation of mitigating evidence. A plurality of Justices concludes that Appellant may not rely upon *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000), *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775 (2006), or *Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268 (2006), as support for his argument that counsel was required to investigate evidence of childhood abuse, family dysfunction and neglect, and mental health and intellectual deficits. *See* Lead Opinion, *op.* at 317–19, 938 A.2d at 387–88. The plurality rationale is that those cases had not been decided at the time of Appellant's trial in 1996, and "[p]rior to *Williams* and its progeny, case law regarding what is required of counsel during the penalty phase was not as exacting as today." *Id.*

Such perspective, however, was rejected in *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761 (2004). There, this Court applied *Wiggins* and *Williams* to counsel's conduct in connection with a trial that occurred in 1981. *See id.* at 361–62 n. 56, 865 A.2d at 813–14 n. 56. In response to a dissenting opinion crafted along the same lines as the majority's present reasoning, the *Hughes* majority explained that *Wiggins* and

*Williams* were also issued in the context of collateral review, occurring many years after trial, and therefore, those decisions did not represent innovations in prevailing federal constitutional law. *See id.* Furthermore, we explained that well before the appellant's trial the ability to present information respecting a defendant's background, character, and the circumstances of the offense was considered a constitutional constituent to a valid capital sentencing scheme, *see id.* (citing *Lockett v. Ohio,* 438 U.S. 586, 602–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978)), and the significance of counsel's role in evaluating this information had been recognized as essential. *See id.* (citing *Gardner v. Florida,* 430 U.S. 349, 360, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977)). Certainly, the *Hughes* Court reasoned, it could not be reasonably maintained that counsel could fulfill his obligation by conducting little or no investigation into an available area of mitigation, particularly when such omission may be of critical consequence to the penalty imposed. *Id.* Indeed, *Hughes* explained, the very standards relied upon in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as guideposts in assessing counsel's performance at trial occurring in 1976, in *Williams* regarding a trial conducted in 1986, and in *Wiggins* involving a trial conducted in 1989, provided that:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.

*Hughes,* 581 Pa. at 361–62 n. 56, 865 A.2d at 813–14 n. 56 (quoting ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980) (The Defense Function; Investigation and Preparation)). As important, the Court continued, the commentary following this standard explains that:

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's

background, education, employment record, mental and emotional stability, family relationships, and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

*Id.* (quoting ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1, cmt). *Hughes* also noted that the ABA standards quoted above were in place since 1971. *See id.* As such, we stated that the prevailing federal constitutional standards as articulated in *Williams* and *Wiggins* pertaining "to counsel's duty to investigate as part of his penalty phase preparation [do] not constitute a retroactive application of a new standard." *Id.; accord Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir.2003) (explaining that "[t]he Court in *Wiggins* clearly holds . . . that it is not making 'new law' on the ineffective assistance of counsel either in *Wiggins* or in the earlier case on which it relied for its standards, *Williams v. Taylor* ").[1]

Here, Appellant's trial counsel repeatedly acknowledged on the post-conviction record that the case for mitigation that he offered at the penalty phase of trial was meager. *See, e.g.,* N.T., May 31, 2000, at 651 (reflecting counsel's explanation, "Well, we didn't have much, you know, and that was the—that was the problem, and so we just, you know, went with what we had[.]"); *id.* at 701 ("as you can see from the record, we didn't have a lot of ammunition to fire, you know, in the death penalty phase, so you just got to go with, you know, the fundamentals of basics [sic]"). Nevertheless, as the lead opinion recognizes, counsel did not attempt to contact most family members, did not obtain various life-history records,

---

1. On this point, I also do not agree with the plurality that the older line of Pennsylvania decisions was as consistent in approving limited investigations as the majority implies. *See, e.g., Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221 (1996) (plurality) (awarding a new penalty hearing where trial counsel neither pursued nor presented any evidence of the defendant's mental state); *id.* at 246, 675 A.2d at 1234 (Newman, J., concurring) ("[T]his Court repeatedly has found that the failure of defense counsel to adequately prepare, particularly in a capital case, is simply an abdication of the minimum performance required. We have specifically held that a failure to investigate witnesses and/or records, that may have established a defense or mitigating circumstance, constitutes ineffective assistance of counsel.").

and did not seek out the advice of a mental health profession-
al. Further, he acknowledged that he had no strategic or
tactical reason for failing to do so. When counsel did contact
a family member, he did not think to ask about Appellant's life
history. *See id.* at 624.

The plurality discounts these facts based on counsel's testi-
mony as to his impression that Appellant did not want to
involve his family and believed that they had no useful infor-
mation, although it acknowledges that Appellant never forbade
counsel from contacting family members. *See* Lead Opinion,
*op.* at 316–18, 938 A.2d at 386–87. Again, however, counsel
was faced with a situation in which the Commonwealth would
likely establish strong aggravation, and he was in possession
of very little effective mitigation evidence. In such a circum-
stance, I do not agree that counsel can reasonably limit his
investigation based on non-binding impressions and prefer-
ences. *Cf. Commonwealth v. Malloy,* 579 Pa. 425, 459, 856
A.2d 767, 788 (2004) ("The onus is not upon a criminal
defendant to identify what types of evidence may be relevant
and require development and pursuit. Counsel's duty is to
discover such evidence through his own efforts[.]").

The PCRA court found as a fact, and it was undisputed at
the post-conviction hearing, that Appellant is borderline men-
tally retarded. As the majority notes in passing, the edu-
cational records that trial counsel should have obtained con-
firm Appellant's poor performance in school. *See* Lead
Opinion, *op.* at 319, 938 A.2d at 388. I have difficulty ac-
cepting the notion that capital counsel presented with a
client who he should have known had performed very poorly
in school, and who is undisputedly borderline mentally re-
tarded, will lack cause to investigate his client's intellectual
functioning as a mitigating factor. In this regard, I would
note that in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242,
153 L.Ed.2d 335 (2002), the United States Supreme Court
determined that, because of their disabilities in areas of
reasoning, judgment, and control of their impulses, mentally
retarded persons do not act with the level of moral culpabili-
ty that characterizes the most serious adult criminal offend-

ers. *See id.* at 306, 122 S.Ct. at 2244. While I agree with the majority that Appellant does not fall within the category of persons as to whom there is a *per se* rule that they cannot be executed, it seems clear to me that an argument to the jurors that Appellant's moral culpability should be assessed in light of his substantially limited intellectual functioning would have been more potent than the mitigation case that was presented at trial. *Accord Williams,* 529 U.S. at 398, 120 S.Ct. at 1515 (commenting that "the reality that [the defendant] was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."). In terms of the prevailing standard governing prejudice, I believe that "there is a reasonable probability that at least one juror would have struck a different balance," *Wiggins,* 539 U.S. at 537, 123 S.Ct. at 2543, in the face of such evidence and argument.

With regard to appellate counsel's performance, he testified that it was his impression that he could only raise trial error and not collateral matters, and therefore, he did not conduct an extra-record investigation. *See* N.T., May 31, 2000, at 714–16. However, the law as of the time of Appellant's direct appeal required direct-appeal counsel to investigate and litigate extra-record claims on pain of waiver. *See Commonwealth v. Grant,* 572 Pa. 48, 66, 813 A.2d 726, 737 (2002) (explaining that, under the rule pertaining at the time of Appellant's trial, appellate counsel had the "burden of raising any extra-record claims that may exist by interviewing the client, family members, and any other people who may shed light on claims that could have been pursued before or during sentencing"). Thus, appellate counsel's stewardship was also clearly deficient.

Justice BALDWIN joins this concurring and dissenting opinion.